IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

_____

UNITED STATES OF AMERICA                  )
                                          )
                                          )
                                          ) CRIMINAL ACTION NO.
VS.                                       ) B-14-876-01
                                          )
KEVIN LYNDEL MASSEY                        )
_____)


MOTION TO SUPPRESS
MOTION TO DISMISS
BEFORE THE HONORABLE ANDREW S. HANEN
MARCH 30, 2015


APPEARANCES:

For the Plaintiff:          MR. WILLIAM HAGEN
                            MR. JASON CORLEY
                            Assistant United States Attorney
                            Brownsville, Texas

For the Defendant:          MR. LOUIS S. SOROLA
                            1999 West Jefferson
                            Brownsville, Texas   78520



THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE
CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY COURT
ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN ASSESSMENT
AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE COPY AT THE
OFFICIAL RATE.
General Order 94-15, United States District Court, Southern
District of Texas.


Transcribed by:             BARBARA BARNARD
                            Official Court Reporter
                            600 E. Harrison, Box 301
                            Brownsville, Texas   78520
                            (956)982-9668

```
 1              THE COURT:  All right.  Be seated.

 2         Okay.  We're here in B-14-92.  I'm sorry.  We're not here in

 3    that case.  We're here in B-14-876, U.S. versus Kevin Lyndel

 4    Massey.

 5         Mr. Sorola, these are your motions.  Why don't you, to start

 6    with, kind of outline where we're going on these.

 7              MR. SOROLA:  The first -- there's a motion to suppress,

 8    Your Honor, and there's also a motion to dismiss.  The motion to

 9    dismiss is on constitutional grounds.  The motion -- well,

10    they're all on constitutional grounds, but the motion to

11    suppress has to do with suppressing the weapons.

12         My client has been charged with possession of four firearms,

13    and it's my argument in the motion to suppress that the

14    government did not have a -- in two of the weapons, an arrest

15    warrant or a search warrant or exigent circumstances which

16    lasted and gave the government the authority to take two of the

17    weapons into custody or seize them.  This occurred on

18    August 29th, 2014.

19         Then on October 20th, 2014, the government allegedly -- or

20    they have an arrest warrant.  They arrested my client.  They're

21    alleging that my client was in possession of one firearm.  And

22    when they searched his hotel room, they found another firearm.

23    Those are the second two weapons.

24         And it's my argument that all of those should be suppressed

25    because they did not have in the first instance arrest warrants;
```

1    in the second instance, a valid arrest warrant or search warrant

2    for the hotel room.  That's the motion to suppress.  I'm

3    basically saying there's no weapons because of your illegal

4    search and seizure.

5         THE COURT:  If -- I mean, if I knock out the last two

6    guns for whatever reason, I mean, it doesn't do anything to the

7    charge, does it?  I mean, isn't the charge still valid because

8    of the first two?

9         MR. SOROLA:  Well, there's four counts.  I mean, he --

10   all the government really needs is one firearm.

11        THE COURT:  That's what I'm asking.

12        MR. SOROLA:  Yes.  If they have one firearm, then they

13   can proceed forward.  It would just be the counts of the

14   indictment because each one of them is charged.

15        THE COURT:  As a separate count?

16        MR. SOROLA:  Yes, Your Honor.

17        THE COURT:  Okay, okay.  And then the motion to dismiss

18   is contingent on the ruling on the motion to suppress, or is it

19   independent?

20        MR. SOROLA:  Well, it's independent, Your Honor, because

21   the motion to dismiss the indictment is first based on the claim

22   that 18 USC 922(g)(1) is unconstitutional and that it goes

23   beyond the authority granted to Congress in the commerce clause.

24   And it's spelled out in my motion that the Second Amendment

25   gives all Americans the right to bear arms.  And what 922(g)(1)

 1    is doing is it's infringing upon that right because it's taking

 2    away my client's right to bear arms.

 3        And what the government is saying, he's a convicted felon.

 4    He has a conviction in which the sentence was a year or more.

 5    And under the federal statutes, that's defined as a felony.  And

 6    because he has this felony, he can never, ever possess a weapon

 7    again.

 8        Well, Texas law -- and he's a Texas resident -- allows him

 9    to reinstate his civil rights.  After five years after his

10    sentence is served, he can have in his possession a firearm in

11    or on the premises that he lives.

12        The statute states, the Texas statute states the premises

13    where he lives.  And what 922 is trying to do is infringe upon

14    that right, which is a right granted to the states.  That's my

15    argument as to the unconstitutionality of the statute.

16        The second part of that, Your Honor, is the infringement on

17    the commerce clause.  If we look at the Pattern Jury Charge for

18    the Fifth Circuit, the third element that the government has to

19    prove is that my client's actions, this possession, in or

20    affected commerce.  And it's our position that he had no affect

21    on commerce and that this -- the overreaching of the commerce

22    clause is what's happening here.  They're going too far, Your

23    Honor.

24        The third argument is an equal protection argument under the

25    equal protection clause of the constitution.  Every state

1    defines differently what's a felony.  What may be a felony in

2    one state may not be a felony in another state, or my term of

3    imprisonment or the sentence I may get may not be more than one

4    year.  So depending on what state I'm in, I may fall into the

5    category that this statute puts me in.

6        And that's my equal protection clause argument, Your Honor,

7    that the laws aren't equal; and therefore, this statute doesn't

8    treat everybody equally who are from different states.

9        THE COURT:  His two disqualifying convictions are two

10   burglary of habitations?

11       MR. HAGEN:  Yes, Your Honor.

12       MR. SOROLA:  Well, yes.

13       THE COURT:  All right.  I didn't mean to cut you off.

14   Were you done?

15       MR. SOROLA:  Yes, Your Honor.

16       THE COURT:  Okay.  Mr. Hagen, do you want to reply?

17       MR. HAGEN:  Yes, Your Honor.  You want me to address the

18   motion to suppress first, what our --

19       THE COURT:  Please.

20       MR. HAGEN:  On August 29th of 2014, Judge, and

21   there's -- down along the river, Border Patrol was in pursuit of

22   some aliens that had entered the United States illegally.  There

23   were several Border Patrol agents in the area.  The defendant

24   and two friends of his, one of them who is a co-defendant, had

25   been camping out along the river for a number of months, and

1  their purpose here is to discourage immigrants from Mexico from

2  entering the United States illegally.  And I think --

3          THE COURT:  They're on public property or private

4  property?

5          MR. HAGEN:  Private property I believe most of the time,

6  although some places along this river, like the levee, I

7  believe, is public, which is a very small stretch.  And I

8  think -- I think there's probably times that people that are

9  patrolling the river may be on the levee; but for the most part,

10  they're on private land.

11          THE COURT:  Do we know if they had the permission of the

12  private landowners to be there?

13          MR. HAGEN:  On the day in question, it's my

14  understanding that they had received permission to be on the

15  land.

16      This is what I know about that.  Border Patrol contacted an

17  individual by the name of Guillermo Aguilar who's the property

18  owner.  He indicated that he had given them permission to be on

19  the land but not to have firearms.  That's the way it was told

20  to Border Patrol.  My understanding is now that he says he never

21  gave permission.

22      I think realistically speaking, he probably did give

23  permission of some kind to the defendant.  But there's been a

24  lot of attention on this case, and it may be that he's feeling

25  uncomfortable.  But I expect that the defendant probably

1   believed, at a minimum believed he had permission to be there on

2   private land.

3        But the defendant and his two friends, all three of them

4   were armed, and they've all been encountered multiple times by

5   Border Patrol, both before and after August 29th, patrolling the

6   river, always armed.

7        And in this particular instance, the defendant was observed

8   by multiple Border Patrol agents with a long gun, an AK47 type

9   rifle.  And he was observed; he had a .45 caliber pistol in his

10  waistband.

11       And the way this all came about is there was one agent that

12  was in heavy brush, and he was in hot pursuit of aliens.  When

13  he came through a clearing, he encountered John Foerster, the

14  co-defendant in this case.  Mr. Foerster had a weapon.  It was

15  an AK47 type pistol.  And when the Border Patrol -- and this is

16  probably disputed.  I don't think that Mr. Foerster ever aimed

17  or was planning on shooting the Border Patrol agent.  But when

18  the Border Patrol agent came through the brush, Foerster turned

19  in his direction, and he was perceived as a threat by the Border

20  Patrol agent who fired several shots at Mr. Foerster, thankfully

21  missing.

22       So that launched a -- an investigation since a federal agent

23  had discharged his firearm.  That's what brought the FBI and the

24  Sheriff's Department and Border Patrol Internal Affairs and all

25  these people out to the area.

1          But as far as suppressing evidence, I think the government

2     is on solid ground here because before the shots were even

3     fired, there are multiple Border Patrol agents that observed

4     Mr. Massey carrying a firearm, and that's what he's charged with

5     is possession of a firearm.  Even before he was ever detained or

6     questioned, he was seen carrying a firearm on August 29th of

7     2014.

8          And the only relevant information or information I'd say

9     that is critical to our prosecution is his identity, who he is,

10    and I don't believe that can be suppressed, although I think --

11    I think law enforcement behaved accordingly in all respects in

12    connection with this investigation.  Even if it was a bad stop

13    or a bad search or -- you can't suppress identity.

14          THE COURT:  So how do we get from out on the border on

15    the river to a hotel room?  Tell me what -- the factual

16    background of that.  Finish up on the border, though.

17          MR. HAGEN:  I'm -- so there was --

18          THE COURT:  They found Mr. Foerster first, and then what

19    happened?

20          MR. HAGEN:  No, they had already -- they had encountered

21    the defendant and a Mr. Varner, a third -- and I'm going to use

22    the word militia guys.  That may not be accurate, but for

23    purposes of this hearing.

24          There were different Border Patrol agents there, and

25    different ones saw different things at different times.

1          THE COURT:  Okay.

2          MR. HAGEN:  But Mr. Massey was certainly observed armed

3     before the shooting ever took place, before shots were ever

4     fired.

5          THE COURT:  On that day?

6          MR. HAGEN:  On that day.  And once the shots were

7     fired -- and Danny Cantu is a Border Patrol agent that I plan on

8     calling as a witness, but he will testify that he saw Mr. Massey

9     armed or that he was with Mr. Varner, who's a militia guy who

10    was armed.  He was talking to him and identifying him.  He was

11    telling Mr. Varner:  Look, there's aliens in the area; that you

12    need to go.  And Mr. Varner told him, you know, there's two

13    other people in my group.

14         The shots were fired.  Then Danny Cantu started moving to

15    where the shots came from, and he encountered Mr. Massey along a

16    road near the river, told Mr. Massey to stay there.  Mr. Massey

17    was armed.  He was clearly armed.  He had a long gun.  I think

18    he was carrying it on a sling.  And Cantu went to where the

19    shooting took place, disarmed Mr. Foerster, led Mr. Foerster out

20    of the brush to the road.

21         All three of them, Massey, Varner and Foerster, were in a

22    Kawasaki ATV, and they drove away from the river.  I believe

23    Mr. Massey said to Danny Cantu:  Look, nobody got hurt.  We'd

24    like to -- you know, we're going to be on our way.

25         Dandy Cantu said:  Look, a federal agent discharged his

1  weapon.  There's going to be an investigation.  Y'all need to

2  stay around.

3      So they moved to a safe area away from the river, a more

4  open area.  People started showing up, other law enforcement

5  officers.  Danny Cantu had IDs from Varner and Massey, and he

6  had identifiers for Foerster who had no ID with him.  He

7  provided that information to the Cameron County Sheriff's

8  Office.  They ran criminal histories.  They learned that

9  Mr. Massey had a felony conviction within 30 or 40 minutes of

10 the shots being fired.

11     Now, Mr. Massey was detained or was in the area for several

12 hours.  I think everyone left around 7:00.  I think the evidence

13 will show that shots were fired around 3:45.

14     But as far as statements made by Mr. Massey, they're really

15 not germane to my prosecution.  I mean, he's charged with being

16 a felon in possession of a firearm.  He was observed in

17 possession of a firearm.  He was identified, and then it was

18 learned that he had a criminal history.

19     He wasn't arrested on August 29th of 2014.  But ATF was

20 contacted, and they began investigating the case.  They had the

21 serial numbers from the weapons which were kept by the Sheriff's

22 Department.  After it was learned that Massey and Foerster both

23 had felony convictions, they made the decision to keep all the

24 weapons.  The weapons were returned to Varner, who did not have

25 a felony conviction, a few days later.

1          THE COURT:  The weapons that Massey and Foerster had?

2          MR. HAGEN:  No, Your Honor.

3          THE COURT:  Or the weapons that --

4          MR. HAGEN:  That Varner had.

5          THE COURT:  -- Varner had?

6          MR. HAGEN:  Varner had a rifle and a pistol.  Massey had

7    a rifle and a pistol, and Foerster had a pistol.  Looks like it

8    belonged to Massey, but that's what he was carrying that day.

9          THE COURT:  All right.  They kept the three weapons.

10         MR. HAGEN:  They kept the three weapons.

11         THE COURT:  All right.

12         MR. HAGEN:  So ATF, they began their investigation.

13   They checked to see whether these weapons had traveled in

14   interstate commerce, and they had.  They also confirmed the

15   prior convictions of Mr. Massey and Mr. Foerster.  They actually

16   got judgments from the various courts where they had been

17   convicted and confirmed that they were indeed felons.

18      Once they had this information, they went to Judge Morgan

19   with a complaint and got an arrest warrant.  They arrested

20   Mr. Massey in October outside his hotel room.  He had a gun in

21   his pocket when they arrested him.

22      When they -- they confirmed that he had been at this hotel

23   for a number of months.  I believe he made one res gestae

24   statement in connection with the arrest when he was told that

25   they were going to do a search warrant, and that statement was,

"There's another gun in the hotel room, but it's not mine."  And

we have the application for the search warrant and the arrest

warrant.  I'm not sure if Your Honor has a copy of those things

or not, but we have those.

A good part of it relies on the event of August 29th of

2014, but it's supplemented.  As far as probable cause is

concerned the defendant is a prolific Facebooker, and he -- he

posted on Facebook his version of events that took place on

August 29th of 2014, which includes him being armed.  And there

are multiple photographs of the defendant armed in the Rio

Grande area.

He's from North Texas, but there's photographs of him -- and

YouTube videos of some of their patrols where it's clear that

he's carrying a weapon.  And that's referenced in the search

warrant.  So it's not wholly contingent upon the events of

August 29th of 2014.

So another weapon is found in his hotel room.  It's a one

bedroom hotel room.

THE COURT:  Was that with a warrant?

MR. HAGEN:  Yes.  That's with a warrant.

THE COURT:  Okay.

MR. HAGEN:  And other items, there were 37-millimeter

rounds.  He's not charged with possessing those.  Those are

items that have only been recently analyzed.  It looks like they

are destructive devices.  Thousands, many thousands or several

```
1    thousand rounds of ammunition was recovered from his vehicle and

2    from his hotel room.  There were incriminating documents,

3    computers with photographs and things of that nature.

4            THE COURT:  All right.  What's the best way to proceed?

5    Do we want to proceed with the government's witnesses?

6            MR. SOROLA:  Yes, Your Honor.

7            THE COURT:  Okay.  Why don't we do that.

8            MR. HAGEN:  Yes, sir.  Do you want me to address the

9    constitutional argument at this --

10           THE COURT:  Why don't we do that afterwards.

11           MR. HAGEN:  Yes, sir.  Our first witness will be Danny

12   Cantu.

13           THE COURT:  Agent Cantu?

14           MR. HAGEN:  I have some other witnesses in the

15   courtroom.  I'm not sure if --

16           MR. SOROLA:  Yes, I'd ask -- I'm sorry.  I'd ask Your

17   Honor that the rule be invoked, and any witnesses who the

18   government plans on calling to testify not be in the courtroom.

19           THE COURT:  All right.  I'm -- if you're going to be a

20   witness, I'm going to excuse you to wait outside in one of the

21   conference rooms.

22       Mr. Cantu, you can come forward.

23           MR. HAGEN:  Your Honor, I have two case agents, Joe

24   Schneider with the FBI and Tony Rotunno with ATF.  I would like

25   them to be excused from the rule, if it please the Court.
```

1          THE COURT:  I will excuse them from the rule.

2      All right.  If you will come up here.

3      *(Witness sworn.)*

4          THE COURT:  Okay.  Be seated, sir.

5      Mr. Hagen, before you start.  Mr. Sorola, if you look

6  around, are there any other witnesses in the courtroom?

7          MR. SOROLA:  I have none, Your Honor.

8          THE COURT:  Okay.  These aren't witnesses?

9          MR. HAGEN:  Agent Rotunno and Joe Schneider is in the

10  courtroom.  I see Shawn Owen, but I don't see him being called

11  as a witness.

12          THE COURT:  Okay.  All right.  Go ahead, Mr. Hagen.

13                          **DANNY CANTU,**

14  the witness, having been first duly cautioned and sworn to tell

15  the truth, the whole truth and nothing but the truth, testified

16  as follows:

17                     **DIRECT EXAMINATION**

18  Q   State your name for the record.

19  A   Danny Cantu.

20  Q   And how are you employed?

21  A   With U.S. Border Patrol.

22  Q   And how many years have you been with the Border Patrol?

23  A   Going on eight years.

24  Q   Prior to working for the Border Patrol, what did you do?

25  A   I was in the United States Marine Corps.

1    Q   How long were you in the Marine Corps?

2    A   Four years.

3    Q   What was your MSO while in the Marine Corps?

4    A   I was a weapons MOS.  Specifically it was 0351 is infantry

5    assault man.

6    Q   Okay.  I want to focus your attention to the date of

7    August 29th, 2014, around afternoon time after 3:00.  Were you

8    on duty that day?

9    A   Yes, sir.

10   Q   And were you patrolling an area near the Sabal Palms

11   Sanctuary?

12   A   Yes, sir.

13   Q   There's a diagram that's --

14        THE COURT:  Stop.  Mr. Hagen, let me stop you.  What's

15   an MSL?

16        MR. HAGEN:  MSO.

17        THE WITNESS:  MOS, military occupational specialty.

18        THE COURT:  All right.  The service is full of initials.

19   I just want to make sure I know what the --

20        MR. HAGEN:  Okay.

21        THE COURT:  Go ahead.

22   BY MR. HAGEN:

23   Q   On the board there's a diagram that's been marked as

24   Government's Exhibit No. 1.  Are you familiar with that area?

25   A   Yes, sir.

```
1    Q   Did you help prepare that diagram?

2    A   Yes, sir.

3    Q   Does that diagram accurately depict the way that area

4    appeared back on August 29th of 2014?

5    A   Yes, sir.

6    Q   Will that help you develop your testimony?

7    A   Yes.

8    Q   Okay.  Now, why were you -- why were you near the river on

9    August 29th of 2014?

10   A   That day I responded to that particular location because we

11   received a notification from the remote video surveillance

12   operator, the person that operates the cameras for the Border

13   Patrol monitoring the area, that there were subjects making

14   their way towards an opening in the border fence there, so we

15   had agents respond to that area.

16   Q   When you say "subjects," are you talking about aliens

17   entering the United States unlawfully?

18   A   That's correct.

19   Q   All right.  How many bodies did you think -- or did you know

20   how many people might be trying to enter the U.S.?

21   A   They didn't give a specific number, so we just -- we knew

22   that there were several subjects.

23   Q   When you say "we," were you patrolling alone, or were there

24   other officers with you or agents with you?

25   A   There were other agents in -- not in my -- in my unit it was
```

1    just myself, and the other agents were also one-man units, but

2    they were -- they were patrolling, responding to the area.

3    Normally we start calling on the radio, and you'll get more than

4    one agent say:  I'm going to here, I'm going there to set up a

5    cordon.

6    Q    Okay.  Did -- had Border Patrol been encountering armed

7    citizens or militia people who had -- who were also patrolling

8    the border?

9    A    Yes.  Never in this area; but, yes.

10   Q    Okay.  So prior to August 29th, there had been encounters

11   with militia people?

12   A    That's correct.

13   Q    All right.  Had there been discussions with Border Patrol

14   officials on how to interact with these militia people when you

15   encountered them?

16   A    Yes.

17   Q    What -- on August 29th of 2014, there were shots fired that

18   day.

19   A    That's correct.

20   Q    Okay.  Before the shots were fired, can you tell the Court

21   where you were before you heard the shots?

22   A    In regards to the map, I was just north of the Kawasaki

23   symbol that's on the map in that open field area.

24   Q    Okay.  There's a laser pointer in front of you.  If you

25   could point to it and tell the judge where you were.

1    A    I was right in that area there.

2    Q    Okay.

3         MR. SOROLA:  Your Honor, may I approach it so I can get

4    a closer look at it?

5         THE COURT:  Absolutely.

6         MR. SOROLA:  I've seen a copy of it, but I just want

7    to --

8         THE COURT:  In fact, if you want to sit there in the

9    jury box, Mr. Sorola, just make yourself comfortable.

10   BY MR. HAGEN:

11   Q    So that's where you were when you heard shots fired?

12   A    That's correct.

13   Q    All right.  Had you seen any militia people in the area

14   before the shots were fired?

15   A    Before the shots were fired, I actually had come in contact

16   with Mr. Varner.

17   Q    Okay.  And was Mr. Varner armed?

18   A    Yes, he was.

19   Q    Okay.  Can you describe the weapons that you observed him

20   carrying?

21   A    When I initially saw him, he was carrying a long rifle.  It

22   was wooded, wooded stocked, which was determined to be that -- I

23   do have the exact make and model.  It is a Winchester Model 70,

24   243 caliber.

25   Q    Okay.  And where --

1    THE COURT:  Let me stop you there for a minute.  Tell me

2    where we are here.  Where is this site?  I mean, if I was going

3    to drive to it, how would I get to it?

4         THE WITNESS:  You can't see the road, sir, but here,

5    this road here leads to the main Southmost Road, the hardtop

6    where most people will come through here, and they'll come visit

7    the sanctuary that is further down.

8         THE COURT:  Okay.  This is down by the Sabal Palms

9    Sanctuary?

10        THE WITNESS:  That's correct.  This is the entrance

11   right here to the Sabal Palms Sanctuary.

12        THE COURT:  Okay.  All right.  Now I know where we are.

13   Go ahead.

14   BY MR. HAGEN:

15   Q   Okay.  And a body of water that appears on Government's

16   Exhibit 1, that's the Rio Grande River?

17   A   That's correct.

18   Q   Okay.  With Mexico on the right side of the exhibit?

19   A   Yes, sir.

20   Q   All right.  Tell the Court where you first saw Mr. Varner.

21   A   Mr. Varner, I first encountered him after -- I was actually

22   here.  There's some bodies that were making their way back into

23   the river.

24   Q   When you say "bodies" --

25   A   There were some illegal subjects that --

1   Q    Okay.

2   A    -- had entered from Mexico.  They were heading back towards

3   Mexico through the brush into the water.

4   Q    Okay.

5   A    After I -- after they splashed into the water, we normally

6   do not try to apprehend them for safety reasons.  They get

7   drowned.  So we allow them to continue back south unless they

8   decide to get help from us.

9       After coming out of this brushy area, I saw Mr. Varner

10   right -- coming out of this entrance right here or exit, as we

11   call it.  Coming out, walking with his longarm.

12   Q    Okay.  Were you talking to Mr. Varner when you heard the

13   shots fired?

14   A    Yes.

15   Q    All right.  And what -- what was the nature of your

16   discussion?

17   A    Since the agents were working the alien traffic,

18   undocumented traffic there in that area, we wanted to ensure our

19   protocol as to if -- because we were having militia in different

20   areas, we would ask them to depart the area while we conducted

21   our law enforcement operations.

22   Q    Is that what you told Mr. Varner?

23   A    Yes.  I asked him if he can tell me how many there were.  He

24   told me there was three of them.  I asked him that I was going

25   to need them to depart the area because agents were working

1    traffic.

2    Q   Okay.  When you said he said there was three of them, did

3    you take that to mean that there were three militia people?

4    A   I took it as that, yes.

5    Q   All right.  What did you do after you heard the shots?

6         THE COURT:  Was that the prior -- I mean, had y'all

7    talked about that at the Border Patrol -- I mean, in briefings

8    and stuff that if you encounter militia during an operation,

9    that the best thing to do was get them out of the way and then

10   proceed with your law enforcement duties?

11        THE WITNESS:  Yes, sir, that's correct, because

12   initially prior to that, they were on private property.  And

13   because the private property extended all the way towards the

14   river, it wasn't an area we can tell them you have to leave

15   this.  They were allowed to be on that private property by the

16   owner of the property.

17      But if we were conducting operations, we did have the right

18   to tell them to leave the area for us to conduct the -- the law

19   enforcement operations.

20        THE COURT:  Okay.  So if you weren't doing anything --

21   if you were just patrolling, let's say, and you encountered

22   somebody that you would consider a militiaman -- and I'm not --

23   I'm using that term just for purposes of this hearing as well.

24   But if you were just patrolling, you would maybe stop and talk

25   to them, but you'd go on about their business and let them go on

1    about theirs?

2            THE WITNESS:  That's correct.  If they're --

3            THE COURT:  But if you're in a law enforcement

4    operational situation, then you would ask them to, you know,

5    leave the premises or get away from where the activity was going

6    on.

7            THE WITNESS:  That's correct, sir.

8    BY MR. HAGEN:

9    Q    All right.  Now, so you're talking to Varner.  You hear the

10   shots fired.  What do you do?  What do you say to Varner after

11   you hear shots fired?

12   A    After the shots were fired, I asked one of the agents to

13   secure the net, which is cease anybody using the radio

14   unnecessarily until we figure out what's happening.  I asked

15   Mr. Varner to accompany me because he said his other friends

16   were further into this entrance.

17       After the shots were fired, they called for a supervisor,

18   and I was already there.  The agents that were calling were the

19   ones that were in the brush.  I wasn't sure.  You know,

20   beforehand I didn't know they were exactly there.  I knew they

21   were in here somewhere.

22   Q    Okay.

23   A    So then Mr. Varner told me that his friends were in here.

24   So I told him:  Okay.  Follow me this way.  So we walked.  And

25   almost immediately coming into this cavernous road, that's where

1    I saw Mr. Massey here in this little brushy area closer to the

2    ATV Kawasaki.

3    Q    Okay.  Let me stop and show you Government's Exhibit No. 2.

4    Does this accurately depict the way Mr. Varner appeared back on

5    August 29th of 2014?

6    A    Yes, sir.

7          MR. HAGEN:  And I'll offer Government's 2.

8          MR. SOROLA:  No objections, Your Honor.

9          THE COURT:  All right.  It's admitted.

10   BY MR. HAGEN:

11   Q    And okay.  So describe how Mr. Massey appeared when you

12   first saw him.

13   A    I'm sorry?

14   Q    How did he appear?  What was he wearing?  What was he

15   carrying?

16   A    Mr. Massey?

17   Q    Yes.

18   A    He was wearing fatigues similar to Varner.  He was carrying

19   a longarm, a automatic weapon, you know, similar to an AK47

20   style weapon.

21   Q    Okay.  And where was it that you first saw Mr. Massey with

22   this long gun?

23   A    Right -- right around this area close to -- close to the

24   Kawasaki ATV, right on the -- he was dismounted from the ATV and

25   he was in the brush line here further -- closer, you know, to

1    the river between -- between the river and the dirt road there.

2    Q   Okay.  Now, the Government's Exhibit No. 1 has a label.  It

3    says Kawasaki ATV.  Is that where the ATV was when you first saw

4    it?

5    A   Yes, sir.

6    Q   Okay.  And also on Government's Exhibit No. 1 is a label

7    that says "shooting."  Is that the area where the shots came

8    from?

9    A   Yes, sir.

10   Q   All right.  Now, did you give any instruction to Mr. Massey

11   after you first encountered him?

12   A   After we encountered them, I asked him and Mr. Varner if

13   they can hang tight.  They were missing one of their -- their

14   friends that was with them, and I wasn't sure where exactly he

15   was.  Again, I was still in the back of my head, the shots had

16   rang out.  They had called for a supervisor.  I was trying to

17   make my way down to where the agents needed me, ensuring safety,

18   that everybody was okay.  So I asked them to stay by their

19   Kawasaki as I continued down this dirt road.

20           THE COURT:  And are you driving?

21           THE WITNESS:  No, sir.  I'm on foot.

22   BY MR. HAGEN:

23   Q   Okay.  So you get to the area where the shooting took place.

24   What do you see?

25   A   As I approach, I see Mr. -- Mr. Foerster holding a weapon in

1   his hand.  It was just hanging down to his side, but he was

2   holding the weapon as an --

3   Q   Okay.  When you say "weapon," are you talking about a

4   firearm?

5   A   Yes, sir.

6   Q   Okay.  I want to show you Government's Exhibit 3.  Is this

7   how Mr. Foerster appeared on August 29th of 2014?

8   A   Yes, it is.

9           MR. HAGEN:  I would offer Government's 3, Your Honor.

10          MR. SOROLA:  No objections, Your Honor.

11          THE COURT:  It's admitted.

12  BY MR. HAGEN:

13  Q   And while I'm at it, Government's Exhibit 4, is this the

14  Kawasaki ATV that you observed on August 29th?

15  A   Yes, sir.

16          MR. HAGEN:  And I'd offer Government's 4 as well, Your

17  Honor.

18          THE COURT:  It's admitted.

19  BY MR. HAGEN:

20  Q   Okay.  So do you have a conversation with Mr. Foerster?

21  A   Yes.

22  Q   All right.  Describe to the -- first describe to the Court

23  what was the area like where the shooting took place?

24  A   As you make your way down into this area, the dirt road is

25  not wide.  It's wide enough for one vehicle at the most.  No --

1    it's not two vehicle traffic or -- you know, so it's one, one

2    vehicle can traverse this road.  That's how wide it is.  Not any

3    wider.

4         So as I came down, I saw Mr. Foerster there holding that

5    weapon.  I saw the agent, Marco Gonzalez, approaches me as I'm

6    getting close, and he's telling me that, you know, he shot at

7    Mr. Foerster; that Mr. Foerster turned in his direction with the

8    weapon and he opened fire.  And I was trying to get -- Foerster

9    started talking, and so I was trying to get everybody to --

10   Q    What was Foerster's demeanor?

11   A    He was upset.  He -- at that point in time, he -- he told

12   Mr. Gonzalez if -- you know, he wanted him to put his weapon

13   down so that he can box him.  He wanted to fight him, you know,

14   confrontation, at which point I asked Mr. Foerster to not move

15   the weapon, to unload the magazine and hand me the weapon he was

16   carrying, at which point he removed the magazine that was

17   inserted and removed the round that was in the chamber and

18   handed me the weapon.

19   Q    Okay.  So did you lead Mr. Foerster out of the -- the brushy

20   area where the shooting took place?

21   A    Yes.  After I accounted that all the agents were safe,

22   nobody was injured at the -- nobody needed medical attention, we

23   started walking.  Except for two agents.  I asked two agents to

24   remain behind where the incident occurred where the shell

25   casings were and where the agent was.  So I asked them two to

1   stay in the area to preserve the scene.  And myself, Mr.

2   Gonzalez and Foerster began walking towards the ATV.

3        As we got to the ATV, Mr. Foerster started telling

4   Mr. Massey what had occurred, and he got in the Kawasaki ATV

5   with them.  I asked them to exit the -- (Speaking Spanish.)

6   This is what we call the (Speaking Spanish) exit.  He exited and

7   waited right here as we, myself and Marcos, walked behind the

8   ATV.

9   Q   And when you say Marcos, you're talking about Marcos

10   Gonzalez?

11   A   Yes, sir, Mr. Gonzalez.

12   Q   And he was the Border Patrol agent that had fired the shots?

13   A   That's correct.

14   Q   Did you have another conversation with Mr. Massey once

15   you've reached the open field just above the Kawasaki ATV label?

16   A   As soon as we exit -- as soon as myself and Mr. Gonzalez

17   come out of the exit, the Kawasaki ATV is just right here in

18   this little turnaround.  Mr. Massey tells me:  You know, as far

19   as we're concerned, nobody was injured.  We want to go on our

20   way.

21   Q   Okay.  And is there a protocol that you need to follow when

22   an officer discharges a weapon?

23   A   Yes.  We need to make notifications.  We need to investigate

24   why the firearm was discharged.

25   Q   Okay.  Now, at this point in time, did you know whether or

1   not Border Patrol Agent Gonzalez had been threatened or whether

2   or not perhaps Border Patrol Agent Gonzalez had irresponsibly

3   fired upon Foerster?  Did you know?

4   A    From what I had gathered, he had fired in -- from what

5   Mr. Gonzalez told me.  Again, this was preliminary.  I was

6   trying to -- I had to speak with everyone to figure out kind of

7   what was actually happening, so I wasn't sure at that point.

8   Q    You didn't know?

9   A    I didn't know.

10  Q    But you were sure that shots had been fired?

11  A    Yes.

12  Q    Okay.  Did you explain to Mr. Massey -- and may I ask you

13  this?  When Massey said, "We want to leave," who was he talking

14  about when he -- when he mentioned or by the word "we"?

15  A    Well, Mr. Foerster, Varner and himself were inside the

16  Kawasaki, so that to me told me they all wanted to depart.

17  Q    Okay.  Do you know where they wanted to go?

18  A    No, I'm not --

19  Q    Okay.  So did you explain to them that an investigation was

20  going to be conducted?

21  A    I did.

22  Q    And how did you explain that to them?

23  A    I told them that they weren't allowed to leave and that we

24  were going to move to a staging area just further up, which is

25  the -- this area right here.  My initial thought -- and the

1    reason I chose this area was to give us distance from the river

2    that was close by.  We moved here to stage the vehicles and kind

3    of get a grip of what actually transpired.

4    Q   Okay.  And did they agree to accompany you?

5    A   Yes.

6    Q   Okay.  Did you have to threaten them in any way to get them

7    to cooperate?

8    A   No.

9    Q   Did they -- were they agreeable to assist in your

10   investigation or did they appear to be?

11   A   Yes, they did.  They were cooperating.

12   Q   All right.  So the area that is labeled "staging area" on

13   Government's Exhibit No. 1, is that where you and Mr. Massey and

14   Mr. Foerster and everybody went after leaving the area close to

15   the river?

16   A   Yes.

17   Q   And was your vehicle in that area?

18   A   Yes.

19   Q   And what kind of vehicle were you operating that day?

20   A   It was a Border Patrol marked Tahoe.

21   Q   Now, did you expect other law enforcement officers to be on

22   scene in short order?

23   A   I did.  We had requested for various agents.  The protocol

24   is to notify the local authorities so they're aware.  And for

25   federal agencies, the investigation arm, investigative arm is

1    the Federal Bureau of Investigation, so they were notified as

2    well.

3         THE COURT:  How many Border Patrol agents?  You talked

4    about you and Mr. Gonzalez.  Were there two or three other

5    agents out there?

6         THE WITNESS:  Two remain here, sir, where the incident

7    occurred --

8         THE COURT:  Okay.

9         THE WITNESS:  -- to make sure that we kept track of

10   where the incident was.

11        THE COURT:  And -- but where were they when the shooting

12   happened?

13        THE WITNESS:  Mr. Areolla was somewhere in this area,

14   and he can -- he can attest to that.

15        THE COURT:  Okay.

16        THE WITNESS:  And Mr. Marcos was following traffic.  He

17   entered the brushy area somewhere in this area and was following

18   the aliens that were running back and ended up coming this way

19   as the aliens were trying to make their way back to the Rio

20   Grande River.

21        THE COURT:  Okay.  So the aliens were actually trying to

22   get back to Mexico at that point in time.

23        THE WITNESS:  Right.  Yes, sir.

24        THE COURT:  All right.  So they would have been running

25   toward Agent Gonzalez.

1          THE WITNESS:  He was giving chase after them as they

2     were running this way.  He -- the aliens were running, and he

3     was following them this way.

4          THE COURT:  Okay.  But they look -- I mean, the way

5     you're pointing makes it look like the aliens were running

6     toward where Agent Gonzalez was, where the shooting happened.

7          THE WITNESS:  No, sir.  Agent Gonzalez was behind them

8     the entire time.  The shooting occurred here because

9     Mr. Foerster was on this road here.  And as agent -- according

10    to Mr. Foerster, what he told me was he saw the aliens coming

11    out of the brush going across this dirt road, and he was yelling

12    at them (Speaking Spanish), to stop, with his -- pointing his

13    weapon at them.

14         THE COURT:  That's the point I'm asking, though.  I

15    think you and I are saying the same thing.

16         THE WITNESS:  Okay.

17         THE COURT:  The aliens were actually running close to

18    where the shooting happened on their way back to Mexico.

19         MR. HAGEN:  Yes.

20         THE WITNESS:  Yes.

21         MR. HAGEN:  With Agent Gonzalez behind them and --

22         THE COURT:  And the other agent coming from the north.

23         THE WITNESS:  And the other agent coming from, yes, the

24    north.

25         THE COURT:  Okay.  All right.

```
 1   BY MR. HAGEN:

 2   Q   All right.  So you make your way to the staging area along

 3   with Massey, Varner and Foerster.  Are there other Border Patrol

 4   agents at that staging area when you first arrived?

 5   A   When we first arrived, there was not.  But maybe within five

 6   minutes, there was at least two more units that arrived.

 7   Q   Okay.  Now, let me show you Government's Exhibit No. 5, 6

 8   and ask you if you're familiar with these -- if you're familiar

 9   with what's depicted in the photograph.

10   A   Yes, sir.

11   Q   Okay.  And Government's Exhibit No. 5, and I'll -- is this

12   an accurate picture of Mr. Massey as he appeared that day?

13   A   Yes.

14           MR. HAGEN:  I'll offer 5.

15           MR. SOROLA:  No objections, Your Honor.

16           THE COURT:  Okay.  It's admitted.

17   BY MR. HAGEN:

18   Q   And Government's Exhibit No. 6, is this the weapon that you

19   took off Mr. Foerster?

20   A   Yes, it is.

21           MR. HAGEN:  All right.  And I'm going to offer

22   Government's 6.

23           MR. SOROLA:  I have no objections to the offering of it

24   other than my motion to suppress it.

25           THE COURT:  Okay.  I'm admitting it for purposes of this
```

1    hearing.

2    BY MR. HAGEN:

3    Q    Okay.  Now, once you arrived at the staging area, did

4    Mr. Massey, Mr. Foerster and Mr. Varner get out of the mule?

5    A    Yes, they did.

6    Q    Okay.  I want to show you Government's Exhibit 7.  Is that

7    the mule parked at the staging area?

8    A    Yes, sir.

9    Q    Does it accurately -- Government's Exhibit 7, does that

10   accurately depict how it appeared at one time on August 29th?

11   A    It does.

12          MR. HAGEN:  Okay.  I'm going to offer Government's 7.

13          MR. SOROLA:  No objections, Your Honor.

14          THE COURT:  It's admitted.

15   BY MR. HAGEN:

16   Q    And same question of Government's 8.  Does that accurately

17   depict the weapon that Varner was carrying back on

18   August 29th of 2014?

19   A    Yes, it does.

20          MR. HAGEN:  I would offer 8 as well.

21          MR. SOROLA:  No objections, Your Honor.

22          THE COURT:  It's admitted.

23   BY MR. HAGEN:

24   Q    Okay.  Now, Government's Exhibit No. 7 and 8, that shows two

25   firearms that were inside the mule.

```
1    A   Correct.

2    Q   Now, were these firearms locked up or secured in any way?

3    A   No, sir.

4    Q   Okay.  Did you make a decision that these firearms needed to

5    be secured?

6    A   I did.

7    Q   Okay.  And how -- how did that come about?

8    A   Since the investigation, since I requested additional

9    investigative agencies to come out and for the purpose of our

10   investigation, since we were going to be conducting law

11   enforcement operations, the safest approach was to have all

12   civilians disarmed as we conducted these investigations.

13   Q   Okay.  Now, was Mr. Foerster still talking about fighting

14   with Agent Gonzalez at this time?

15   A   At this point he was mentioning to Mr. Massey at the staging

16   area that he -- he was still amped up, and he still wanted to

17   box Mr. Gonzalez.

18   Q   Okay.  So did you -- did you tell Mr. Massey and Mr. Varner

19   that you thought it would be a good idea if they put their

20   weapons in your vehicle?

21   A   No.  I told them that they were going to be secured in my

22   vehicle.

23   Q   Did they have any problem with that?

24   A   No.

25   Q   Okay.  And how did the weapons come from the Kawasaki to
```

1    your vehicle?

2    A    Border Patrol agent removed them from the Kawasaki, brought

3    them over towards my Tahoe, at which point I opened.  And as we

4    were placing them in the unit, we were keeping track of the

5    weapons.

6    Q    Okay.  And what was the condition of these weapons as far as

7    being loaded?

8    A    They were all loaded.  We had to unload them.

9    Q    Okay.  Were there rounds in the chamber as well as loaded

10   magazines?

11   A    There was loaded magazines.  I do not recall if there was

12   rounds in the chamber.

13   Q    All right.  Now, while you were securing the -- once you

14   told Mr. Massey that you thought these weapons should be secured

15   in your vehicle, how did he respond?

16   A    He did not object to that.  Actually he -- him and

17   Mr. Varner did approach me and tell me:  Well, we have pistols.

18   They had pistols I hadn't seen because Mr. Massey's shirt kind

19   of concealed the pistol.  I wasn't aware he was carrying a

20   pistol.  I told him yes, we would secure those as well.

21   Q    Okay.  And so how did the pistols make their way into your

22   Border Patrol vehicle?

23   A    They removed it from their waistband and brought it to the

24   back of my unit.

25   Q    Okay.  So did they place them in your vehicle themselves?

1    A    Yes.

2    Q    Or did you place them in the vehicle?

3    A    They did.

4    Q    Okay.  Now, did you ask Mr. Massey to provide you with an

5    ID?

6    A    I did, sir.

7    Q    At what point in time did you make that request?

8    A    Our initial encounter, as I approached him with Mr. Varner.

9    Q    Okay.  And did -- did he provide you with an identification?

10   A    He did.

11   Q    Okay.  And what did you do with it?

12   A    I had his identification, Mr. Varner's with me.  I asked

13   Mr. Foerster if he had an ID, which he did not.  I was

14   attempting to take the biographical information.  As we do in

15   most cases where there's law enforcement work, we need to

16   identify who -- which parties are involved.

17   Q    Okay.  Now, as these weapons were placed in your vehicle,

18   did you get the serial number off each weapon?

19   A    Yes, I did.

20   Q    And did you determine who owned each weapon, or did you ask

21   these people who owned which weapons?

22   A    I took down who was carrying each weapon that day as I wrote

23   it down in the notebook that I have that I was taking notes that

24   day.  I didn't specifically ask for ownership of which weapon.

25   I knew who was carrying what weapon, so that's what I wrote down

```
 1    in my book.
 2    Q    Okay.  So how many weapons did you observe Mr. Massey
 3    carrying?
 4    A    That day he had two on him.
 5    Q    Okay.  What time did the shooting take place?
 6    A    At approximately 3:45.
 7    Q    Okay.  And do you know --
 8              THE COURT:  3:45 in the afternoon?
 9              THE WITNESS:  Yes, sir.
10    BY MR. HAGEN:
11    Q    Do you know about what time you asked Mr. Massey to
12    accompany you to the staging area?
13    A    It wasn't -- everything occurred so quick, it was within
14    minutes.  I can give you a rough.
15    Q    The shooting took place.  You went and met with Foerster and
16    Agent Gonzalez.  Then you made your way out of the brush with
17    Mr. Foerster's weapon, met with Mr. Massey, followed them out
18    to -- for a length of time, and then you made a request that
19    they accompany you to the staging area.  Can you -- if you don't
20    have the exact time, can you give me an estimate about what time
21    you made that request?
22    A    15 minutes after the shooting more or less.
23    Q    Okay.  And that's an approximate number?
24    A    That's an approximate time, yes.
25    Q    All right.  Now, who was the first law enforcement officer
```

1  to arrive on the scene other than Border Patrol agents?

2  A    That was the Cameron County Sheriff's Department.  It was

3  Deputy Daniel Valerio, Sergeant Daniel Valerio from the Cameron

4  County Sheriff's Office.

5  Q    And when Sergeant Valerio showed up, did you provide the IDs

6  from Mr. Massey and Mr. Varner to him?

7  A    Yes, sir.  I had not been able -- had time to conduct any

8  further investigations on those.  When I say that, I mean run

9  records.  I mean, normally typically run records when we

10 encounter people.  I had not had the time.  I was attempting to

11 secure everything that -- when Mr. Valerio showed up, I handed

12 him the identifications and kind of gave him the rundown of what

13 had occurred, and he took over at that point.

14 Q    Okay.  And do you know about what time Sergeant Valerio

15 showed up?

16 A    He showed up 1619 hours, 4:19 p.m.

17 Q    Okay.  The -- what time did you -- and did you have any

18 other dealings with Mr. Massey or Mr. Foerster, or did you

19 assist in investigating this shooting after other law

20 enforcement officials showed up?

21 A    After other law enforcement -- after the other agencies

22 showed up, my main job was to coordinate the location of the

23 incident and their vehicle, what weapons they were carrying, so

24 that's -- I recanted what weapons that you were carrying and

25 where the incident took place after that.

1    Q    Okay.  So you showed people where the shooting took place?

2    A    Exactly.

3    Q    All right.  Was there an investigation in that area?  Were

4    shell casings recovered and things of that nature, do you know?

5    A    There was.

6    Q    All right.  What time did you get to leave?

7         THE COURT:  Wait, wait.  Did you do that investigation,

8    you being the Border Patrol, or did the Sheriff's Department do

9    that?

10        THE WITNESS:  The Sheriff's Department, sir.

11        THE COURT:  Okay.

12   BY MR. HAGEN:

13   Q    What time did you leave the staging area?

14   A    In its entirety?

15   Q    Yes, sir.

16   A    Everyone was departed around 7:00 p.m.

17   Q    Okay.  Now, I want to show you Government's Exhibit No. 9.

18   Is this an accurate picture of all the weapons that were placed

19   in your Border Patrol vehicle except for the --

20   A    Minus the smaller weapon that Foerster was carrying, yes.

21        MR. HAGEN:  Okay.  I'm going to offer Government's 9.

22        MR. SOROLA:  I have no objections subject to my motion,

23   Your Honor.

24        THE COURT:  Okay.  It's admitted for the hearing.

25   BY MR. HAGEN:

1   Q    In Government's Exhibit No. 9, you can see an elbow and a

2   shirt sleeve.  Who does that belong to?

3   A    That is Sergeant Valerio's.

4   Q    The sheriff's officer that was first on scene?

5   A    Yes.

6   Q    Did you say Valdez?

7   A    Valerio.

8   Q    Valerio, okay.  Was Mr. Massey ever handcuffed or given

9   instructions to stay -- sit in a vehicle, or did anything like

10  that happen while you were there?

11  A    No, sir.  He was being cooperative.  He wasn't -- you know,

12  he was being cooperative.  He was not handcuffed.  He was not

13  placed in any vehicle.  He was hanging around the shady area of

14  one of the vehicles there.

15  Q    Okay.  Was he free to walk about from -- from the Kawasaki

16  mule over to the -- any shade that might be afforded by the

17  trees along the edge of the road?

18  A    Yes, sir.  He moved from the Kawasaki to the -- to the road.

19  Him and Varner and Foerster moved about in that small area.

20  Q    Okay.  And were they provided any kind of drinks or anything

21  like that?

22  A    Bottle water.

23  Q    Who provided the bottled water?

24  A    The Border Patrol brought a vehicle out with a ice chest

25  full of bottled water to hand out to everyone.

1   Q    Okay.  Did you ever -- once Sergeant Valerio showed up, did

2   you ever talk to Mr. Massey again?

3   A    No.

4   Q    What is the distance that was -- that you traveled from --

5   the distance that you moved -- scratch that.  Let me rephrase.

6        How far is it from the staging area to the area that's

7   labeled "Kawasaki ATV" on Government's Exhibit No. 1?  What is

8   that distance?

9   A    That's roughly about 260 yards.

10  Q    Okay.

11       MR. HAGEN:  Pass the witness.

12                      **CROSS-EXAMINATION**

13  BY MR. SOROLA:

14  Q    Agent Cantu, did you ever get a warrant?

15  A    I'm sorry?

16  Q    Did you ever get a warrant?

17  A    No, sir.

18  Q    When you first started testifying, you had mentioned camera

19  operations.

20  A    Yes, sir.

21  Q    Was all this on camera?

22  A    Not that area.  You can only -- the camera can only capture

23  the -- this area here, roughly around this area.  They can see

24  them as they're running up or if they're coming out of this area

25  to make that exit right there between the fence.  So it's just

1    this area.

2    Q    So we're clear, the area where the shooting took place, the

3    area where the Kawasaki ATV was and the staging area are not

4    visible by cameras.

5    A    No, sir.

6    Q    Now, you had mentioned that camera operations had spotted

7    what they thought were illegal aliens?

8    A    Yes, sir.

9    Q    And are those cameras -- when they see this video being --

10   is there a recording of it?

11   A    Yes.

12   Q    You were standing with Mr. Varner when the shots were

13   fired --

14   A    Correct.

15   Q    -- correct?

16         THE COURT:  Let me go back to Mr. Sorola's last

17   question.  That recording is in existence now and still exists?

18         THE WITNESS:  I can check back, sir.  I'm not sure if

19   it's 45 days or how long they keep those, those system.

20         THE COURT:  Okay.  Go ahead, Mr. Sorola.

21   BY MR. SOROLA:

22   Q    But your notebook, the notepad you have still exists.

23   A    Yes, sir.

24   Q    And have you provided copies of that to Mr. Hagen?

25   A    No, sir.

1   Q    You're standing with Mr. Varner when the shots were fired,

2   correct?

3   A    Correct.

4   Q    And he has a rifle.

5   A    Correct.

6   Q    If we can go back and look at the exhibits.  Can you

7   identify -- I believe it was Exhibit No. 8?

8            MR. SOROLA:  May I approach, Your Honor?

9            THE COURT:  You may.

10           THE WITNESS:  Yes.

11  BY MR. SOROLA:

12  Q    In Exhibit No. 8, which rifle did Mr. Varner have?

13  A    The wood stocked Winchester.

14  Q    Okay.  And he had this in his possession when the shooting

15  occurred.

16  A    Correct.

17  Q    What other weapons did Mr. Varner have?

18  A    At that time, I believe that was all he had.  Obviously he

19  had a pistol that I wasn't aware he was carrying.

20  Q    But you were in no fear of Mr. Varner, that Mr. Varner was

21  the one shooting?

22  A    No.

23  Q    To your knowledge, at any time were any of those weapons

24  fired at this shooting?

25  A    The Winchester was not, as he was speaking with me when the

1    shots were fired.

2    Q    So at the time of this shooting, do you know who's

3    discharging what weapons?

4    A    No.

5    Q    Okay.  Later on do you find out who is shot -- who is firing

6    a weapon, a firearm?

7    A    Upon approaching the -- the Foerster and Mr. Gonzalez area,

8    yes.

9    Q    And Agent Gonzalez is the only one that discharged a weapon;

10   is that correct?

11   A    At that point, that's what I was told, yes.

12   Q    And you were told that by Agent Gonzalez, right?

13   A    Correct.  And Mr. Foerster attested to that.

14         THE COURT:  And you said at that time.  I mean, nothing

15   subsequent to that time has changed that, have they?

16         THE WITNESS:  No, sir, no.  It's just that --

17         THE COURT:  So as far as you know sitting here today,

18   the only weapon that was shot was -- the only weapon discharged

19   was discharged by Agent Gonzalez.

20         THE WITNESS:  Correct.

21   BY MR. SOROLA:

22   Q    And this is about 3:45 in the afternoon, correct?

23   A    Correct.

24   Q    Now, you testified earlier that you told Mr. Massey he could

25   not leave the area, right?

1    A    Correct.

2    Q    So he wasn't free to leave.

3    A    No.

4    Q    He had to stay there.

5    A    Yes.

6    Q    What would you have done had he tried to leave?

7    A    I could have detained -- placed him in handcuffs, put him in

8    a unit to secure him to prevent him from leaving the area.  But

9    he was being cooperative, and none of that was necessary.

10   Q    Now, when you encountered Mr. Massey, where was he on the

11   map?

12   A    He was just -- well, we'll call it north of his Kawasaki in

13   this brushy area.  Appeared that he was -- as myself and Varner

14   were coming in in this opening, he was coming from this brushy

15   area up towards the -- this dirt road here.  And I say up

16   because there's like a kind of a slant towards the river.

17   Q    And when the shooting occurred, you didn't take Mr. Varner's

18   weapon from him, did you?

19   A    No, sir.

20   Q    You didn't disarm him?

21   A    No.

22   Q    You didn't frisk him?

23   A    No.

24   Q    When you encountered Mr. Massey, did you check him for

25   firearms?

1   A    Just the one he was carrying, the longarm, the AK47 weapon.

2   Q    But you didn't take it from him?

3   A    I did not.

4   Q    You leave Mr. Varner and Mr. Massey at the ATV?

5   A    Correct.

6   Q    And then --

7        THE COURT:  Let me -- and I assume when you first

8   encounter Mr. Massey, you and Mr. Varner walk in that direction,

9   I mean, did you ask him:  Hey, who's shooting?  I mean --

10       THE WITNESS:  Well, sir, my main purpose was to get to

11  the agents that were already requesting a supervisor.  And my

12  thoughts were that, you know, the safety of the agents as they

13  were calling for -- for --

14       THE COURT:  Okay.  But you had no -- you obviously

15  didn't have any reason to think Mr. Massey was the one that had

16  done the shooting because --

17       THE WITNESS:  No, I --

18       THE COURT:  -- you went on.  You left him there and went

19  on.

20       THE WITNESS:  Correct.

21       THE COURT:  Okay.

22  BY MR. SOROLA:

23  Q    Then you encountered Mr. Foerster with Agent Gonzalez --

24  A    Yes.

25  Q    -- correct?

1   A    And Agent Areolla and Agent -- let's see who else was there.

2   Haley.   Haley, Agent Haley.

3   Q    Haley?

4   A    Yes, sir.

5   Q    Were you aware if any of those agents had asked assistance

6   from any of the militia members?

7   A    No.

8   Q    Had you ever asked for any of their assistance?

9   A    No.

10  Q    Now, you're testifying that you were in communication with

11  an agent who needed assistance or was requesting assistance,

12  right?

13  A    Yes.

14  Q    How are you communicating with him?

15  A    It was put out over the communications radio stating that

16  they needed a supervisor to the scene.

17  Q    And the communications radio, is it being recorded?

18  A    The communications log down much like -- much like this.  As

19  agents respond, they type in into their system a time and agent

20  and what the request was.

21  Q    So much like a 911 call, it's -- there's a record?

22  A    Yes.

23  Q    So now you've left Mr. Massey and Mr. Varner at the ATV, at

24  their vehicle, right?

25  A    Correct.

1    Q    And then you head farther north and encounter Agent

2    Gonzalez, Areolla, Haley and Mr. Foerster.

3    A    Correct.

4    Q    And at this time, Mr. Foerster has a firearm?

5    A    Yes, sir.

6    Q    So nobody took Mr. Foerster's firearm from him?

7    A    No, sir.  Mr. Foerster had told me that after the shooting,

8    he placed his weapon on the ground, picked his hands up.  By the

9    time I arrived, he had the weapon back in his possession.

10            THE COURT:  And you had him unload it?

11            THE WITNESS:  Yes, sir.  I took the weapon and had him

12    unload it.

13    BY MR. SOROLA:

14    Q    Then you and Agent Gonzalez head south back towards the ATV,

15    correct?

16    A    Correct.

17    Q    And what happens next?

18    A    It's myself, Mr. Foerster, and Mr. Gonzalez heading back

19    towards the ATV.  I told them we needed to make it to a safer

20    area.  Again, we're just working traffic there.  We -- it's not

21    safe to remain right by the river.  So we started walking

22    towards Mr. Varner and Mr. Massey.

23        Once we linked up with them, I asked them to get in their

24    gator, exit the brushy area and wait for us at the exit, which

25    they -- this is the exit.  So they came here to this turnaround,

1    to this opening, and myself and Mr. Gonzalez approached them

2    right here.

3    Q    So at this time, who's driving?

4    A    Mr. Massey.

5    Q    And where are the firearms?

6    A    Mr. Massey has it between him, and Mr. Foerster is his

7    passenger.  And in the back seat, Mr. Varner was sitting there

8    with his longarm kind of -- exactly like you see him in the

9    photos.

10   Q    So at any time did you ask anybody for consent to search the

11   vehicle?

12   A    The Kawasaki?

13   Q    Yes, the Kawasaki.  They didn't have another vehicle there,

14   right?

15   A    No, sir.

16   Q    So as far as you know, Mr. Varner, Mr. Massey, and

17   Mr. Foerster in the ATV.

18   A    Correct.

19   Q    That's their vehicle.

20   A    Yes.

21   Q    And you tell them to move to a safer area, and you go to the

22   exit of the brushy area?

23   A    Yes, sir.

24   Q    And at no -- at this time you don't have any of the

25   firearms?

1  A   I have the firearm that Mr. Foerster was carrying in my

2  hand.

3  Q   And just so we're clear, which one is that one?

4         MR. SOROLA:  May I approach, Your Honor?

5         THE COURT:  You may.

6         MR. SOROLA:  Sorry.

7         THE WITNESS:  That's this one.

8  BY MR. SOROLA:

9  Q   And that's Exhibit number --

10 A   Six.

11 Q   -- 6.  They come to this exit.  And who's there at the exit?

12 Mr. Foerster, Mr. Massey, Mr. Varner, Agent Gonzalez and

13 yourself.  There's five of you there initially, correct?

14 A   As soon as we exit, there's five of us, yes.

15 Q   And then what happens?

16 A   Mr. Massey mentions:  As far as we're concerned, nobody is

17 hurt.  You know, we would like to take off.  And I told him they

18 couldn't leave.  That I was going to move them over to a staging

19 area just -- from the point of the exit to the staging area, you

20 could see the curve.  They were going to move over there, and

21 that's where we moved.

22 Q   Okay.  So you told Mr. Massey, who's driving, to move over

23 to the staging area?

24 A   That's correct.

25 Q   And then what happens at the staging area?

1    A    I park my vehicle.  They park behind me.  They -- because my

2    vehicle was right at the exit as well.  My Border Patrol unit

3    was right here.  So as soon as we came out, I got in my vehicle,

4    moved it to the staging area.  Mr. Massey followed, parked his

5    Kawasaki right behind my vehicle, and they exited their Kawasaki

6    and were by my unit.

7    Q    Okay.  Mr. Massey is standing by your unit.

8    A    Right.

9    Q    And Mr. Varner is where?

10   A    All three of them came -- came together by the unit.  They

11   all exited the Kawasaki, and they were by the unit.

12   Q    Okay.  And where are the firearms?

13   A    They remained in the Kawasaki.

14   Q    And at any time did you ask Mr. Massey for consent to search

15   this Kawasaki?

16   A    No, sir.  The weapons were in plain view, and I needed to

17   secure them so that they -- there's no windows or doors on this

18   Kawasaki.

19   Q    Let's get specific.  What weapons?  Now, just so we're

20   clear, you already have the weapon that Mr. Foerster had.

21   A    Correct.

22   Q    So you had that one, right?

23   A    Yes.

24   Q    So that one's not in the Kawasaki?

25   A    No, that's in my -- in the passenger seat of my vehicle.

1    Q    Okay.  What was the next weapon that you secured?

2    A    Were all the weapons.  Were all the weapons -- I let them

3    know that I was going to secure the weapons that they had with

4    them that were in the Kawasaki just behind my unit.

5    Q    Okay.  What weapons were in the Kawasaki?

6    A    It was the Winchester Model 70 and the Centurion 39 Sporter.

7    Q    And so we're clear, the Winchester is the wood stocked

8    rifle.

9    A    Yes, sir.

10          THE COURT:  That Mr. Varner was carrying?

11          THE WITNESS:  Yes, sir.

12   BY MR. SOROLA:

13   Q    The Centurion is the AK47.

14   A    Yes, sir.

15   Q    What were the other weapons that you secured?

16   A    After securing those weapons, Mr. Massey and Mr. Varner told

17   me that they had pistols on them, which again I was not aware.

18   They asked me if they would be securing those weapons.  I said

19   yes, so we secured those weapons in the vehicle.

20   Q    Okay.  So Mr. Varner and Mr. Massey just tell you out of the

21   clear blue:  We also have firearms on us?

22   A    Yes.

23   Q    And you didn't see these firearms prior to them telling you?

24   A    I did not.

25   Q    But then are you saying that Mr. Varner then handed you

1  the -- the firearm that he had?

2  A   Yes, sir.

3  Q   And what did Mr. Massey do?

4  A   Same thing.  They both removed the -- their pistols and put

5  them in the back of my unit.  The pistols were downloaded and

6  placed there with the remainder -- with the other rifles.

7  Q   And do you know who had which pistol?

8  A   Yes.  As they removed it from their waistband, I wrote down

9  who was carrying which one.  Mr. Massey was carrying the

10  Springfield XDS .45 caliber, and Mr. Varner was carrying the

11  Llama .45 caliber pistol.

12  Q   Who removed the Winchester and the Centurion from the ATV?

13  A   It was a Border Patrol agent, sir.  I don't recall exactly

14  what agent it was.

15  Q   But it wasn't you?

16  A   It wasn't me.

17  Q   And then a Sheriff's officer arrives at the scene, and

18  that's Valerio?

19  A   Yes, sir.

20  Q   Do you know if the Cameron County Sheriff's Department at

21  any time secured a search warrant?

22  A   I'm not aware.  I'm not sure.

23  Q   Ultimately who came into possession of these firearms?

24  A   They were turned over to the Cameron County Sheriff's

25  Office.

1    Q    But when Sergeant Valerio gets there, these firearms are in

2    your possession?

3    A    Yes, sir.

4    Q    You already have them in your vehicle?

5    A    I do have them secure.

6    Q    How long was it that Mr. Massey was not free to leave this

7    area?

8    A    In its entirety, sir, or the investigative agency showed up?

9    Q    In its entirety.  From 3:45 when shots are fired, when is

10   Mr. Massey free to go?

11   A    He departed -- I'm -- I can't tell you exactly who told him

12   it was -- after the investigative agency showed up, they began

13   to interview him.  And which agency ultimately told him they

14   were done with their interviews, I couldn't tell you.

15           THE COURT:  But by 7:00, everybody was gone but --

16           THE WITNESS:  Yes, sir, that's correct.

17           THE COURT:  Why did the Sheriff's Department investigate

18   it?  I mean, is that kind of protocol because they're the local

19   law enforcement in charge of that area?

20           THE WITNESS:  That's correct, sir.  We always notify the

21   locals.

22           THE COURT:  Okay.  But then was there also some federal

23   agency that did an investigation?

24           THE WITNESS:  FBI showed up, and we did also have -- we

25   had various.  We had FBI.  HSI also showed up.  We had the

1   Federal Fish and Wildlife show up because there is a federal

2   land further back that bumps into the sanctuary, so -- and it's

3   unclear exactly where the cutoff is, so they brought him out to

4   see if there's -- if there was federal land out there where the

5   incident occurred.

6          THE COURT:  Did everybody do an investigation, or how

7   many investigations are there?

8   BY MR. SOROLA:

9   Q   Do you know?

10  A   I'm not sure, sir.

11         THE COURT:  I don't know.

12         THE WITNESS:  I don't know exactly how many there are.

13         THE COURT:  We know the Sheriff's Office did one.

14         THE WITNESS:  Yes.

15         THE COURT:  And I take it you believe the FBI has done

16  one?

17         THE WITNESS:  They were out there.  I'm not sure to what

18  extent.

19         THE COURT:  Or whether HSI did one?

20         THE WITNESS:  I'm not sure, sir.

21         THE COURT:  Okay.  All right.

22  BY MR. SOROLA:

23  Q   Do you know if the ATF did one?

24  A   I'm not sure.

25  Q   Now, you mentioned federal land.

1   A    Yes.

2   Q    Where the shooting occurred, whose land is that?

3   A    The sanctuary's land.

4   Q    Okay.  And we're talking about the sanctuary.  We're

5   referring to Sabal Palms?

6   A    Yes, sir.

7   Q    So it's not federal land?

8   A    No.

9   Q    How about the exit where you exited the brushy area?

10  A    No, sir.  It's actually federal land was further back,

11  further down from the shooting.

12  Q    Okay.  And when you say further back, you mean further

13  north?

14  A    It's further south.  True north is actually this corner of

15  the map.

16  Q    Okay.  When you say this corner, we're referring to the left

17  upper hand corner?

18  A    Yes.

19  Q    And I'm only asking, Agent Cantu, because we're making a

20  record, and we can't see what the record -- what you refer to

21  "in this corner," we can't see that.  We need to describe it.

22  A    Okay.  Further -- if you want -- do we call south further

23  down from the shooting?

24  Q    Yes.

25  A    Further south is federal land.

1  Q   How far further south?

2  A   I couldn't tell you.  I'm not sure.

3      THE COURT:  Obviously it's on the other side of the

4  sanctuary, though?

5      THE WITNESS:  The sanctuary, sir, goes down, and it goes

6  into a finger and it continues on.  It's quite a big area.  And

7  federal land somewhere back there bumps into sanctuary land.

8  And I'm not sure exactly where the merge is.

9  BY MR. SOROLA:

10 Q   But the sanctuary is private land.

11 A   Yes.

12 Q   You got possession of Mr. Massey's identification and

13 Mr. Varner's identification --

14 A   Yes, sir.

15 Q   -- correct?

16 A   Correct.

17 Q   And you did that pretty quick after the shooting.

18 A   Yes, sir.

19 Q   But then you handed that over to the Sheriff's Department?

20 A   Yes, sir.

21 Q   But at no time were you afraid that Mr. Massey or Mr. Varner

22 was going to shoot you?

23 A   I was not afraid, no.

24 Q   And the shooting occurred very quickly.  And when I say

25 that, it was rapid fire shots.

1   A    Yes.

2   Q    And that's at 3:45.  And after that, there's no more

3   emergency, is there?

4   A    No.

5         MR. SOROLA:  If I can have one moment, Your Honor?

6         THE COURT:  Sure.

7   BY MR. SOROLA:

8   Q    Agent Cantu, as all of this is happening, you're writing it

9   down?

10  A    The key points, I started writing them down.  As soon as the

11  scene was moved over to the staging area, I did remove my

12  notebook and started jotting everything down.

13  Q    And has anybody asked you for your notebook?

14  A    No, sir.  I used those notes to conduct this -- my report.

15  Q    But that notebook is the notebook that you're referring to

16  that you have here in court?

17  A    Correct.

18        MR. SOROLA:  No further questions, Your Honor.

19        THE COURT:  Thank you.

20                    **REDIRECT EXAMINATION**

21  BY MR. HAGEN:

22  Q    The Sabal Palms area is privately owned, correct?

23  A    Yes, sir.

24  Q    But is it open to the public?

25  A    It is.

1   Q    And do you know what hours it's open to the public?

2   A    It operates 8:00 to 5:00.  And they have a metal gate that

3   shuts right here in the front so no vehicles come in.  There's a

4   big sign that's posted, 8:00 to 5:00.

5   Q    Okay.

6   A    Hours of operation.

7   Q    Once the Sheriff's Department and the other investigators

8   arrived, was it their decision as to whether or not Mr. Massey

9   could leave, or were you still playing a role in whether he

10  could stay or could go?

11  A    No, sir.  It's investigator's decision to determine the

12  outcome of the investigation after that.

13  Q    Now, are you an investigator?

14  A    No, sir.

15          MR. HAGEN:  That's all I have, Your Honor.

16          THE COURT:  So you kept everybody at the scene basically

17  until the sheriff arrived, and then you turned it over to him.

18          THE WITNESS:  Yes, sir, until an investigative agency

19  can determine who was a part in the -- who was going to be part

20  of the investigation.

21          MR. HAGEN:  I'm sorry.  Can I ask another question, Your

22  Honor?

23          THE COURT:  Go ahead.

24  BY MR. HAGEN:

25  Q    Agent Cantu, when you put the weapons in your vehicle, were

1  you planning on keeping them, or why did you put them in there?

2  A   I put them in there for safety reasons period.  There were

3  other law enforcement coming, and we had other agents out there

4  that were showing up to secure the scene, and I didn't want any

5  civilians armed with weapons.  I secured them for the duration

6  of the investigation.

7  Q   Okay.  At the time that you -- that you asked them to put

8  their weapons in your vehicle, did you think they were going to

9  probably get their weapons back down the road for later --

10  A   I wasn't sure what was going to happen with the weapons.

11  Q   But that wasn't a decision you were going to make?

12  A   No, no.  It was strictly for officer safety reasons is the

13  reason I secured them.

14          MR. HAGEN:  That's all I have, Your Honor.

15          THE COURT:  Thank you.  You may step down, agent.

16      Who would be next, Mr. Hagen?

17          MR. HAGEN:  Sergeant Valerio.

18      I'm sorry, Your Honor.  Is it all right?  I've already

19  approached.

20          THE COURT:  That's all right.  He's no longer a witness.

21          MR. HAGEN:  Can this witness be excused?

22          THE COURT:  Yeah.

23          MR. HAGEN:  Thank you.

24          THE COURT:  Sergeant, are you going to be able to make

25  it up one step?

```
 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  Don't hurt yourself.  Looks like you've

 3     already done that.

 4          (Witness sworn.)

 5              THE COURT:  All right.  Be seated, sir.  Thank you.

 6                            DANIEL VALERIO,

 7     the witness, having been first duly cautioned and sworn to tell

 8     the truth, the whole truth and nothing but the truth, testified

 9     as follows:

10                          DIRECT EXAMINATION

11     BY MR. HAGEN:

12     Q    You settled in?

13     A    Yes.

14     Q    Sergeant, would you tell the court reporter what your name

15     is.

16     A    Daniel Valerio.

17     Q    And how are you employed?

18     A    I'm employed with the Cameron County Sheriff's Office.

19     Q    Are you currently on leave from duty?

20     A    Yes.

21     Q    Okay.  For the record, you are on crutches and appear to

22     have a broken ankle or broken foot?

23     A    Broken ankle, yes.

24     Q    Back on August 29th of 2014, were you on duty?

25     A    Yes, I was.
```

1    Q    And were you dispatched to an area near the Sabal Palms

2    Sanctuary to assist in the investigation of a shooting?

3    A    That's correct.

4    Q    Okay.  Can you tell the Court about what time you arrived at

5    the area where the shooting had occurred?

6    A    Can I look at my notes --

7    Q    Sure.

8    A    -- to be exact?  I arrived there at the location at 4:18.

9    Q    4:18?

10   A    Yes.

11   Q    Okay.  Did you observe some people that -- I'm going to call

12   them militia men.  Did you observe some citizens that were

13   dressed in camouflage?

14   A    Yes, I did.

15   Q    Okay.  Did you observe or did you meet with an individual by

16   the name of Danny Cantu?

17   A    Yes, I did.

18   Q    And did he provide you with any ID cards?

19   A    Yes, he did, with three ID cards from the persons that were

20   there.

21   Q    Okay.  Did he provide you with three ID cards or two ID

22   cards?

23   A    As far as I can remember, it was three ID cards.

24   Q    Okay.  Did you -- did you run -- did he also show you some

25   weapons that he had in his vehicle?

1    A    Yes, he did.

2    Q    And soon after arriving, did you request criminal histories

3    and a warrant search on the IDs that had been provided to you?

4    A    Yes, that's correct.

5    Q    Okay.  And can you tell the Court about what time you

6    requested these criminal histories?

7    A    Yes.  It was at 4:24.

8    Q    And about what time would you receive -- did you learn that

9    Mr. Massey had a -- had felony convictions?

10    A    Yes, sir.  About five minutes, give or take a minute after I

11    started running them at 4:24, which would have been 4:28,

12    4:29 more or less.

13    Q    Okay.

14    A    A few minutes after.

15    Q    All right.  Now, did you have reason to believe that

16    Mr. Massey had been carrying a weapon or weapons on that date

17    prior to your arrival?

18    A    Yes, I did.

19    Q    Why did you think that?

20    A    I was informed by the -- by David Cantu that this -- the

21    suspects, the persons that were there, they were carrying these

22    weapons that he had shown me.

23    Q    Okay.

24    A    Not that I observed them, but that's what I was advised.

25    Q    Okay.  Did you also run a check on all the weapons by serial

1   number to determine whether they may have been stolen?

2   A   Yes, I did.

3   Q   Okay.  And were any of them stolen?

4   A   No, they were not.

5   Q   Okay.  Were there any warrants for Mr. Massey or Mr. Varner

6   or Mr. Foerster?

7   A   No, there were not.

8   Q   Okay.  Was there anyone that had felony convictions or

9   felony conviction record other than Mr. Massey?

10   A   I believe it was Foerster had another conviction.

11   Q   All right.  Did you -- when you first arrived, did you think

12   Mr. Massey had committed a crime?  And I'm talking about before

13   you ran the criminal history or anything like that.  When you

14   first arrived, did you think he had done anything that -- where

15   he should be detained or arrested?

16   A   No.  I only had the information on the shooting, but we

17   didn't know at that point in time what actually had happened.

18   Q   Okay.  So if Mr. Massey would have asked you when you

19   arrived at 4:18, told you, "I'm getting out of here," would you

20   have let him go?

21   A   At that point, yes.

22   Q   Okay.  Now, after you learned that he had been in possession

23   of a weapon and he had a felony conviction, did your position

24   change on whether or not you would let him go if he would have

25   asked?

1    A    Yes, it changed based on the information I had and his

2    record and him being in possession.  It had changed, that he

3    would have been asked to stay.

4    Q    And this is sometime around 4:29, 4:30, something like that?

5    A    Yes, yes.

6    Q    Okay.  Did -- were you concerned about what to do with the

7    weapons after learning that Mr. Massey and Mr. Foerster had

8    felony priors?

9    A    Yes.

10   Q    So what did you do to figure out what should be done with

11   the weapons?

12   A    I contacted the investigation division, you know, in my

13   department, made contact with Lieutenant Diaz.  I informed him

14   over the phone of what we had of the record and also the weapons

15   we had on hand.

16   Q    Okay.

17   A    Prior to his arrival there.

18   Q    Okay.  Now, Mr. Massey had a weapon and a felony prior, but

19   is that why you were out there in the Sabal Palms area, to

20   investigation Mr. Massey?

21   A    No.  We were out there for the shooting itself.

22   Q    Okay.  And what kind of investigation was conducted by the

23   Sheriff's Department in connection with the shooting?

24   A    The investigation was at the -- who -- how it happened, who

25   was the one carrying the weapons also, and who was the one that

1   did the shooting, which was Border Patrol involvement.

2   Q    And did y'all try and speak with Border Patrol Agent

3   Gonzalez?

4   A    Yes, we did.

5   Q    Okay.  Was he going to visit with anybody?  Was he going to

6   talk about what happened?

7   A    No.  They -- we were informed that he was not going to

8   provide a statement out there.

9   Q    All right.  And who gave you that information?

10  A    Let me see.  Mr. Gerardo Reyes "Rey" Gonzalez.

11  Q    Okay.

12  A    He was the one who informed me that Agent Gonzalez was not

13  going to provide a statement.  He was the union leader.

14  Q    Okay.  A Border Patrol union leader?

15  A    Yes.

16  Q    All right.  Now, did members with the Cameron County

17  Sheriff's Office CID department show up?

18  A    Yes.

19  Q    Is that Criminal Investigative Division?

20  A    Yes, that's what it is.

21  Q    Okay.  And what kind of investigation did they conduct?

22  A    They were conducting the -- the alleged shooting and see how

23  it occurred, see if there was a --

24  Q    And did they go to the scene where the shooting took place?

25  A    Yes.  They walked out to the scene where the shooting took

1   place.

2   Q    Did they try and collect evidence from the scene?

3   A    That's correct.  They collected some casings out there.

4   Q    When you say casings, do you mean shell casings?

5   A    Shell casings, yes.

6   Q    All right.  Did -- were the other Border Patrol agents

7   interviewed by members of the Cameron County Sheriff's

8   Department?

9   A    I'm not -- I'm not sure on that.

10  Q    All right.  Now, did you speak with -- towards the end of

11  the shooting investigation, did you speak with your supervisor

12  to determine whether or not you should return the weapons to

13  Mr. Massey, Foerster and Varner or maintain custody of them?

14  A    That's correct.  I spoke to Lieutenant Diaz.  And based on

15  the field investigation, he advised that we were going to

16  collect the weapons.  We were going to take custody of them for

17  further investigation.

18  Q    Okay.  And was that because of the felony convictions?

19  A    Correct.  That's correct.

20  Q    All right.  The -- now, you didn't witness Mr. Massey carry

21  any gun, did you?

22  A    That's correct.

23  Q    And you didn't see Mr. Foerster with a weapon?

24  A    That's correct.

25  Q    Your belief that they possessed these weapons was based on

1    your conversation with Border Patrol Agent Danny Cantu?

2    A    That's correct.

3         MR. HAGEN:  All right.  I'll pass the witness.

4         THE COURT:  Mr. Sorola, cross?

5                   **CROSS-EXAMINATION**

6    BY MR. SOROLA:

7    Q    Sergeant, did you ever get a warrant to take possession of

8    the firearms?

9    A    No, I did not.

10   Q    When you arrived at 4:18, was there any emergency?  Was the

11   shooting over?

12   A    That's correct, yes.

13   Q    Well, when you arrived, the firearms were actually in the

14   possession of Border Patrol, right?

15   A    That's correct.

16   Q    And when you arrived at 4:18, as far as you're concerned,

17   Mr. Massey was free to leave?

18   A    That's correct.

19   Q    Do you know if he was under orders from any other law

20   enforcement not to leave?

21   A    No, I did not.  I had no knowledge of that.

22   Q    You don't know?

23   A    I don't.

24   Q    But at this time, you have his identification card.

25   A    That's correct.

1    Q    And you have Mr. Varner's identification card.

2    A    Uh-huh.  Yes.

3    Q    Did you give them back to them?

4    A    After I -- after I did the inquiry, yes.

5    Q    Okay.  And when you do this inquiry, what are you doing?

6    A    Checking for any outstanding warrants.

7    Q    Okay.  How are you doing it?

8    A    Through our dispatch, our county dispatch.

9    Q    So you're on a radio, and you call Cameron County dispatch.

10   A    Yes.

11   Q    And what do you do?

12   A    I relay the information on hand which was the IDs, ID

13   numbers, and then ask for the -- for any outstanding warrants,

14   any entries, if he's got any anything, any entries on his

15   record.

16   Q    And did you talk to Mr. Massey or Mr. Varner?

17   A    I spoke to them very briefly when they handed the IDs.

18   Q    Did you ask them where they lived?

19   A    I just wanted to confirm the address where the ID that they

20   showed me, if they still lived there.

21   Q    If I have a felony conviction on my record, is it against

22   the law for me to have a firearm?

23   A    It depends if it's within five years, sir, or not.  That's

24   something that we would have to further -- be further looked

25   into.

1  Q    After you -- well, how was it that these firearms came into

2  your possession?

3  A    Border Patrol handed it to me.  When they told me where they

4  were, I went and looked at them in the truck, in the Border

5  Patrol truck.  That's when I got all the serial numbers, ran

6  them, and then that's when I was advised that they couldn't take

7  possession of them.

8         MR. SOROLA:  May I approach, Your Honor?

9         THE COURT:  You may.

10 BY MR. SOROLA:

11 Q    And if you look at Exhibit No. 9, sergeant, is that your

12 elbow in that picture?

13 A    I believe so.

14 Q    Did you also take pictures?

15 A    I believe I did, yes.

16 Q    And where are all the pictures that you took?

17 A    To my best of my knowledge, if I took -- if I took pictures,

18 I would have submitted to -- them with my report.

19 Q    Okay.  And you submitted your report to who?

20 A    We submitted it to the CID, investigation division.

21 Q    And that's the Criminal Investigation Division of Cameron

22 County?

23 A    Cameron County.

24 Q    Cameron County Sheriff's Department, right?

25 A    Yes.

1   Q   What time did you leave?

2   A   I left the scene 6:57 I believe.   6:57.

3   Q   Is that --

4   A   That's what my records show when I -- when I checked out,

5   when I leave the -- when I left there.

6   Q   And did you leave the scene with the firearms?

7   A   Yes.

8   Q   And what are you driving?   Where are they?

9   A   They're -- I put them in my Tahoe, the Cameron County issued

10  unit, which is a Tahoe, 2014 Tahoe.

11  Q   And how did you -- well, what else did you take from the

12  scene?

13  A   We took all the rifles, all the weapons, and also a camera

14  that was also with the -- with the weapons as well.

15  Q   Did you take anything else?

16  A   Not that I can recall, no.

17  Q   Did you make an inventory?

18  A   Yes.

19  Q   And you submitted that inventory with your report?

20  A   Yes.

21  Q   Did you tag the weapons?

22  A   Yes.

23  Q   And then where did you go from the scene?

24  A   Went directly to the Sheriff's Office and submitted the

25  weapons to the evidence department.

1    Q   And you're not in charge of the evidence department?

2    A   No, I'm not.

3    Q   How many firearms did you check in?

4    A   Five.

5    Q   And as we are here today, you don't know how many are still

6    in evidence?

7    A   I would -- I don't have that knowledge.  I wouldn't know.

8            MR. SOROLA:  No further questions at this time, Your

9    Honor.

10           THE COURT:  Mr. Hagen, anything else?

11                    **REDIRECT EXAMINATION**

12   BY MR. HAGEN:

13   Q   Mr. Massey wasn't arrested on August 29th, was he?

14   A   No, he wasn't.

15   Q   Did you see him leave the area?

16   A   No, I did not.

17   Q   Do you know if he left the area?

18   A   I wouldn't know.

19   Q   Okay.  Did you see other law enforcement officials in the

20   area where the shooting took place besides the Sheriff's

21   Department?

22   A   Yes, Border Patrol.

23   Q   Any other federal agencies?

24   A   FBI.

25   Q   Okay.  Anybody else that you saw?

1    A    I believe the Parks and Wildlifes were out there as well.

2    Q    Okay.  Is this -- this is private land, but is the -- do you

3    know if the Sabal Palms is open to the public?

4    A    As far as I know, yes.

5    Q    Okay.  Is it -- under state law, is it permissible for

6    anyone without a concealed handgun license to carry a weapon in

7    a public area without a license?

8    A    Under state law -- can you repeat that again, please?

9    Q    Yeah.  That was not a good question.

10        Can anyone carry a concealed weapon on public land in Texas?

11   A    No.

12   Q    Can anyone do that?

13   A    No.

14   Q    Do you have to be licensed to do that?

15   A    That's correct.

16   Q    Do you know if Mr. Massey was licensed to carry concealed?

17   A    I wouldn't know.

18            MR. HAGEN:  All right.  Pass the witness.

19            THE COURT:  Anything else, Mr. Sorola?

20            MR. SOROLA:  No, Your Honor.

21            THE COURT:  All right.  Thank you, sheriff.  Be careful

22   getting down.

23            MR. HAGEN:  May he be excused, Your Honor?

24            THE COURT:  Yes.

25            MR. CORLEY:  Government calls David Cordova.

1    THE COURT:  Tell you what, Mr. Corley.  Let's take a ten

2  minute break before we get yelled at by the court reporter.

3    *(Recess taken from 3:13 to 3:32.)*

4    THE COURT:  Be seated.

5    Mr. Corley, you were starting to say?

6    MR. CORLEY:  Government calls David Cordova, Your Honor.

7    THE COURT:  Cristi, will you swear Mr. Cordova in?

8    *(Witness sworn.)*

9                    **DAVID CORDOVA,**

10  the witness, having been first duly cautioned and sworn to tell

11  the truth, the whole truth and nothing but the truth, testified

12  as follows:

13                  **DIRECT EXAMINATION**

14  BY MR. CORLEY:

15  Q    Would you please state your name for the record.

16  A    David Daniel Cordova.

17  Q    And what do you do for a living, Mr. Cordova?

18  A    I am a special agent with the FBI here in Brownsville,

19  Texas.

20  Q    How long have you been doing that?

21  A    I've been employed with the FBI for approximately seven

22  years.

23  Q    And in that time, have you received any training as it

24  pertains to interviewing witnesses?

25  A    Yes, sir.

1    Q    What type of training have you received?

2    A    I received training at the academy to conduct interviews and

3    interrogations.

4    Q    On how many occasions?

5    A    On multiple hours of, you know, interview training.

6    Q    And on how many different occasions have you also

7    interviewed individuals as part of your job?  On few or many

8    occasions?

9    A    Multiple occasions over -- over a hundred interviews or more

10   than that.

11   Q    Okay.  On August 29th of 2014, were you employed with FBI?

12   A    Yes, sir.

13   Q    And were you called in to interview a witness at that date?

14   A    Yes, sir.

15   Q    And what were the circumstances under which you were called

16   in to interview that witness?

17   A    At approximately 5:30 p.m. I received a phone call from my

18   supervisor who indicated that there had possibly been an assault

19   on a federal officer, and so he asked me to go out to the area

20   of Sabal Palms and Southmost Boulevard to help out with

21   interviewing multiple witnesses.

22        So I drove out there.  It took me approximately 30 minutes

23   to make it out there.  And met up with my supervisor, at which

24   point I met up with another individual by the name of Jeremy

25   Bergeaux.

1  Q   Let me stop you right there.  What time did you arrive at

2  Sabal Palms?

3  A   At approximately 6:00 p.m.

4  Q   Okay.  And when you arrived, who did you come into contact

5  with?

6  A   Initially with my supervisor and then another --

7  Q   Who is your supervisor?

8  A   Shawn Owen.

9  Q   Okay.  And then who else?

10 A   My ASAC, acting ASAC Sam Miranda, and then some other agents

11 that were on the scene.  Karen Chastain and an FBI TFO.

12 Q   Were there other law enforcement other than FBI present?

13 A   Yes.

14 Q   And was every -- where was everybody grouping up?  I mean,

15 where did you come into contact with -- with these individuals?

16 A   So where this red dot is right there, I ended up parking

17 like just north of there, got off my vehicle and then walked

18 over and spoke to my supervisor and the different law

19 enforcement personnel that were present.

20 Q   Okay.  Did you come into contact with Mr. Massey thereafter?

21 A   I did.

22 Q   And how did that come about?

23 A   After talking to my supervisor, he indicated that we needed

24 to conduct these witness interviews.  Mr. Massey was either -- I

25 don't recall if he was standing or sitting in a -- in an ATV

1    that was located somewhere in this area.

2        So I approached him along with an HSI special agent, and I

3    asked him to walk over to the side of the road, the dirt road

4    near a vehicle where we ended up initiating an interview.

5    Q    Okay.  Why did you interview Mr. Massey?

6    A    Mr. Massey?  At the time it was my understanding that he was

7    a witness to a shooting.  A Border Patrol agent had discharged a

8    firearm, and so I needed to obtain the details of what happened.

9    Q    Okay.  At that time -- did you state earlier that you were

10   investigating a possible assault on a federal agent?

11   A    That's correct.

12   Q    And were you also investigating a possible assault by a

13   federal agent?

14   A    That is correct.

15   Q    Okay.  So at this time what facts were you aware of when you

16   began your interview of Massey?

17   A    When I initiated the interview, I knew that there had been

18   shots fired, and I knew that Border Patrol agent had discharged

19   his weapon and that there was multiple individuals that were in

20   the area that we needed to interview as witnesses.

21   Q    Okay.  And was Mr. Massey just the first that you happened

22   to come into contact with?

23   A    Yes.

24   Q    Were there other agents doing interviews as well?

25   A    Yes.

1   Q   When you came into contact with Mr. Massey, would you

2   describe his demeanor for the Court?

3   A   He was very cooperative.  I mean, cooperative.

4   Q   In your opinion, was he free to go?

5   A   Yes.

6   Q   Okay.  So if he had declined to answer your questions and

7   declined to participate and walked away, what would you have

8   done?

9   A   There's not much that I could have done at that point.

10  Q   Okay.  During this conversation with the defendant, did you

11  ask him who the other individuals he was with were?

12  A   I did.

13  Q   And who did he identify?

14  A   He mentioned the two individuals who -- he called them by

15  aliases.  One of them was Wolf, and the other one was Jesus.

16  Q   Okay.  Who did Jesus turn out to be?

17  A   Jesus, I later learned that his true name was John Foerster.

18  Q   And who did Wolf turn out to be?

19  A   Edward Varner or something like that.

20  Q   Did the defendant indicate to you why they were located on

21  that stretch of land?  Why they were located in Sabal Palms?

22  A   Yes.

23  Q   Okay.  Did someone give them permission to be there?

24  A   Yes.

25  Q   What did the defendant indicate to you in terms of having

1    permission to be there or not?

2    A   So he indicated that they were part of a volunteer group

3    that were out there patrolling to prevent illegal aliens from --

4    or deter illegal aliens from coming across.  He indicated that

5    an individual by the name of Guillermo Aguilar had provided him

6    authorization and the two other individuals that were with him

7    to be on the piece of property.

8    Q   Discussing the volunteer group, are those the words that he

9    used to characterize it?

10   A   Yes.

11   Q   Okay.  When he was discussing this volunteer group with you,

12   was that after questioning by you, or was he offering his

13   opinion on the status of the group he was in?

14   A   It was intertwined.  It was during the questioning, and he

15   was also offering his opinion.

16   Q   Okay.  Was he clear about the number of individuals in this

17   group?

18   A   Yes.

19   Q   How many individuals?

20   A   Including himself?

21   Q   Including himself.

22   A   A total of three.

23   Q   I'm sorry?

24   A   Including himself, a total of three.

25   Q   Okay.  And were they -- the three of them, were they part of

1    a larger group?

2    A    Yes, they were.

3    Q    And what is that group called?

4    A    I don't know.

5    Q    Okay.  Did he indicate to you where that group usually is

6    located?

7    A    He did.

8    Q    And where is that?

9    A    He indicated that they usually stage at Monsees property in

10   Brownsville, Texas.  And he wasn't able to recall the first

11   name.

12   Q    Was he specific with you about whether the group were

13   volunteers or militia?

14   A    He was specific.  He indicated they were volunteers.

15   Q    And that they were not militia; is that correct?

16   A    That is correct.

17   Q    Did you question him about which weapons he and the other

18   two individuals that were with him, Wolf and Jesus, what weapons

19   they were in possession of?

20   A    Yes.

21   Q    Okay.  What answers did he give you?

22   A    He indicated that he was carrying an assault rifle, an AK47,

23   and a handgun.  He also indicated that Jesus was carrying an

24   AK47, and that the AK47 -- he claimed ownership of that AK47.

25   And he indicated that the other gentleman was carrying a 243.

1    Q    Okay.  And Wolf is Varner; is that correct?

2    A    That is correct.

3    Q    Okay.  So Varner --

4         THE COURT:  The one that Jesus was carrying was a AK47

5    pistol?

6         MR. CORLEY:  That's correct, Your Honor.

7         THE WITNESS:  My understanding was that it was an AK47

8    assault rifle.

9    BY MR. CORLEY:

10   Q    Okay.

11        MR. CORLEY:  May I approach, Your Honor?

12        THE COURT:  You may.

13   BY MR. CORLEY:

14   Q    I'm handing you what's marked as Government's Exhibit 6.

15   Does that look like the weapon he would have been describing?

16   A    Yes.

17   Q    Okay.  And is that an AK47 style pistol?

18   A    Yes.

19   Q    With a foregrip, correct?

20   A    Yes.

21   Q    And does the foregrip then change its classification?

22   A    I'm not intimately familiar with the classifications of the

23   firearms.

24   Q    Okay.  Thank you.

25        Did the defendant indicate to you what the group was doing

1    down there, what their goal was?

2    A    Yes.

3    Q    And what was that?

4    A    He indicated that they were out there conducting patrols,

5    voluntary patrols in an attempt to deter illegal aliens from

6    crossing from Mexico into that property.

7    Q    At the time that you met with Massey early on -- excuse me,

8    the defendant early on, was he unclear of who had fired the

9    shots?

10   A    Yes, he was.

11   Q    Okay.  What did he tell you he initially thought the shots

12   being fired were?

13   A    He indicated that he heard what he thought to be four shots

14   and that he thought that the -- the shots were coming from

15   Mexico.

16   Q    Do you know when the defendant left the scene and the

17   staging area and moved on?

18   A    Yes.

19   Q    And what time was that?

20   A    It was about ten minutes prior to us leaving the area.  We

21   left around 7:00 -- between 7:00 and like 7:10 p.m., somewhere

22   in there.

23   Q    So would you say approximately 7:00 p.m.?

24   A    That is correct.

25   Q    And did you say that you -- earlier you said you received a

1  call at 5:30 to get to the area.  When did the interview

2  actually begin?

3  A   At approximately 6:00 p.m.

4       MR. CORLEY:  I'll pass the witness, Your Honor.

5       THE COURT:  Mr. Sorola?

6                    **CROSS-EXAMINATION**

7  BY MR. SOROLA:

8  Q   Agent Cordova, I don't understand.  What's the difference

9  between militia and volunteer?

10 A   I don't -- I mean, as far as a militia and volunteer, when I

11 talked to him, he indicated that they were at the property

12 conducting volunteer patrols.  They were there willingly.

13 Q   You arrived at -- and if you'll refer to the map -- what is

14 marked as the staging area.  Do you see where I'm referring to?

15 A   Uh-huh.

16 Q   Okay.  And you arrived at the staging area at 6:00 p.m.; is

17 that correct?

18 A   Thereabout.

19 Q   Well, how do you know what time it was?

20 A   How do I know what time it was?  Because I kept track of --

21 on my notes.

22 Q   Okay.  So you made notes of this event --

23 A   That is correct.

24 Q   -- correct?  And when you arrived there, it's your testimony

25 that Mr. Massey was free to leave.

1   A    That is correct.

2   Q    When you arrived there, how many other law enforcement

3   personnel were there?

4   A    There was multiple personnel.

5   Q    Okay.  When we say "multiple," are we referring to five,

6   ten, 15 --

7   A    Between 15 and 20.  I didn't specifically count.

8   Q    So there were a lot of law enforcement there, right?

9   A    Yes, between 15 and 20.

10  Q    Different agencies, correct?

11  A    That is correct.

12  Q    You had Border Patrol, you had Homeland Security, you had

13  the Cameron County Sheriff's Department.

14  A    That is correct.

15  Q    Did you know if the Alcohol Tobacco and Firearms were there

16  also?

17  A    Not to my knowledge.

18  Q    Well, and then you have the FBI show up too.

19  A    That is correct.

20  Q    And how many FBI agents were on scene?

21  A    Agents?  It was myself, my supervisor, his supervisor, and

22  another agent out of Brownsville.  Total of four.

23  Q    Do you --

24  A    And -- correction, five.

25  Q    Do you know if Mr. Massey was told by any of these law

1   enforcement agents that he could not leave?

2   A   I don't know that.

3   Q   So somebody could have told Mr. Massey, "You can't leave.

4   You need to stay here"?

5   A   That's possible.

6   Q   And you interviewed Mr. Massey, correct?

7   A   That is correct.

8   Q   Now, other than your notes, this interview wasn't recorded.

9   A   Recorded?

10   Q   Either --

11   A   It was memorialized in a 302.

12   Q   Okay.  But was it voice recorded or video recorded?

13   A   It was a non-custodial interview, so it was not recorded.

14   Q   He wasn't in your custody, right?

15   A   No.

16   Q   Do you know if he was in anybody's custody?

17   A   To my knowledge, he wasn't.

18   Q   When you arrived at 6:00, you didn't see him with any

19   firearms, right?

20   A   That is correct.

21   Q   Where were the firearms?

22   A   I think they were behind or inside a Border Patrol vehicle.

23   Q   Did you take any photographs when you went out there to

24   investigate?

25   A   I did not.

1    Q    Do you know if any of the other FBI agents, your supervisor

2    or anybody took any?

3    A    One of our TFOs I believe took some photos.

4          THE COURT:  What's a TFO?

5          THE WITNESS:  Task force officer.

6    BY MR. SOROLA:

7    Q    And you never got any kind of warrant to take custody of any

8    firearms, right?

9    A    No, sir.

10   Q    Did your involvement with Mr. Massey and this incident end

11   on that day, on the 29th?

12   A    I think after he was arrested, I was at the office, and they

13   brought him into the office.  I briefly helped just to secure

14   him at the office.  But other than that, that was the extent of

15   my involvement.

16   Q    So Agent Cordova, you weren't an investigator into --

17   A    I was not.

18   Q    From the FBI out of the five people who were there, were you

19   the first on scene?

20   A    I was the fourth on scene.

21   Q    The fourth?

22   A    Yes.

23   Q    Had anybody else conducted any interviews of Mr. Massey that

24   you know of?

25   A    No.

1   Q   When you conducted this interview with Mr. Massey, was he by

2   himself?

3   A   Yes.

4   Q   And where did you conduct this interview?

5   A   We conducted it off the side of the dirt road next to the

6   open field.  So if you look at the staging area here, somewhere

7   in there.

8   Q   Just standing outside?

9   A   Standing out -- yes, sir.

10   Q   And around you are between 15 and 20 other law enforcement

11   personnel.

12   A   That is correct.

13   Q   And to your understanding, what time did this shooting take

14   place?

15   A   I don't know because I wasn't part of the original

16   investigation.  I was called out just to assist with the

17   interviews.

18   Q   But you received this call at 5:30?

19   A   That is correct.

20       MR. SOROLA:  No further questions, Your Honor.

21               **REDIRECT EXAMINATION**

22   BY MR. CORLEY:

23   Q   Just to be clear, Agent Cordova, the focus of this

24   investigation was not on the defendant Massey, was it?

25   A   That is correct.

1   Q   It was not, correct?

2   A   Yes, he was not.

3   Q   At the time that you showed up at Sabal Palms and you began

4   to investigate Massey, did you have any knowledge whatsoever of

5   his prior felony convictions?

6   A   I did not.

7   Q   Was your focus on what happened as it pertained to the

8   firearms being discharged?

9   A   Yes, sir.

10          THE COURT:  Now, when you showed up at Sabal Palms, you

11   didn't show up to investigate Massey?

12          THE WITNESS:  I did not.  I --

13          THE COURT:  You were just asked to interview him.

14          THE WITNESS:  That is correct.

15   BY MR. CORLEY:

16   Q   And at the beginning of the interview with the defendant

17   Massey, did he indicate to you that he did not know Wolf or

18   Jesus' real name?

19   A   He didn't.

20   Q   Okay.  So he did say that he did not know their names,

21   correct?

22   A   That is correct.

23   Q   But he did say that he had -- that he was the proper owner

24   of the weapon that Foerster or Jesus had had in their

25   possession; is that correct?

1    A    That is correct.

2    Q    So the defendant admitted to you during the interview that

3    the weapon that was involved in the investigation, meaning the

4    shooting -- let me rephrase it.

5        Jesus/Foerster was the individual involved in the incident

6    with Border Patrol agent; is that correct?

7    A    That is correct.

8    Q    And the defendant admitted to you that that man was in

9    possession of a weapon that he owned.

10   A    Yes.

11   Q    But that he did not know the man's real name.

12   A    That is correct.

13        MR. CORLEY:  I'll pass the witness, Your Honor.

14        THE COURT:  Anything else, Mr. Sorola?

15        MR. SOROLA:  Real quick, Your Honor.

16                    **RECROSS-EXAMINATION**

17   BY MR. SOROLA:

18   Q    Who -- who asked you to interview him?

19   A    My supervisor.

20   Q    And who's that?

21   A    Shawn Owen and Sam Miranda.  Not to interview him

22   specifically, but they asked me to go out there and conduct the

23   interviews from witnesses, so just to be clear.

24   Q    Who else did you interview?

25   A    He's the only one that I interviewed.  What happened is when

1   I showed up at the scene, there was other agents there, so we

2   split up in groups.  The other agents interviewed the other two

3   individuals, and I ended up interviewing him along with an HSI

4   agent.

5   Q    And when you're referring to "him," you're referring to

6   Mr. Massey?

7   A    That is correct.

8   Q    And how long did your interview last?

9   A    Approximately 30 minutes.

10  Q    And who else did you talk to besides Mr. Massey?

11  A    No one else.

12  Q    Well, when you got there, did you introduce yourself, or

13  what did you say?

14  A    To --

15  Q    Mr. Massey.

16  A    -- Mr. Massey?  I identified myself as an FBI agent.  I told

17  him that I was there to conduct a witness interview and that it

18  was my understanding that he either heard or had observed some

19  shots that were fired.

20  Q    And you hadn't talked to anybody else about whether

21  Mr. Massey had a firearm on him or not?

22  A    No.

23  Q    Well, how is it that you can just walk up to --

24  A    There's a conversation on the phone when I initially got

25  called is when I was told that there's some firearms that were

1    discharged and there was possibly a Border Patrol agent that was

2    involved and that there was some witnesses that I needed to

3    interview.  So when I showed up, they pointed the -- pointed out

4    the witnesses.  Mr. Massey was one of those individuals, so

5    that's when I approached him to conduct the interview.

6    Q   And, Agent Cordova, who is "they"?  "They pointed out."

7    A   My supervisor.

8    Q   Okay.

9              MR. SOROLA:  Nothing further, Your Honor.

10             THE COURT:  Okay.  Do we know who Guillermo Aguilar is?

11             THE WITNESS:  I do not know.

12             THE COURT:  And we don't know what land he purportedly

13   owns?  I mean, he doesn't own Sabal Palms, does he?

14             MR. HAGEN:  I think he's the caretaker, and I think

15   he -- my understanding is he owns the land where the shooting

16   took place.

17             THE COURT:  Okay.

18             MR. HAGEN:  And that that land is privately owned but

19   open to the public.

20             THE COURT:  Okay.  So he does have some involvement with

21   Sabal Palms.

22             MR. HAGEN:  It is, and I'm not sure of the extent, Your

23   Honor.

24             THE COURT:  Okay.  All right.  Thank you, agent.  You

25   may step down.

1          THE WITNESS:  Thank you.

2          MR. CORLEY:  Your Honor, upon tendering to defense

3    counsel, government moves to admit Government's Exhibit 10 and

4    Government's Exhibit No. 11 which are copies of the arrest

5    warrant and application for a search warrant.

6          MR. HAGEN:  Judge, that would I think conclude the

7    evidence that we have to present in connection with the

8    suppression motion.  I mean --

9          THE COURT:  Well, here's what I -- here's what I haven't

10   heard.  I haven't heard anything about going to a motel, and I

11   understand two of the guns were --

12         MR. HAGEN:  And that's why we're offering -- the arrest

13   warrant covers that.  He was arrested pursuant to a warrant,

14   Your Honor.

15         THE COURT:  Okay.

16         MR. HAGEN:  And my understanding is that, you know, the

17   arrest warrant is going to rise and fall.

18         THE COURT:  Who arrested him?

19         MR. HAGEN:  Agent Rotunno with ATF.  He wasn't involved

20   in this investigation at all, so he prepared an affidavit which

21   we have for the Court's review and --

22         THE COURT:  All right.  Let me --

23         MR. CORLEY:  May I approach, Your Honor?

24         THE COURT:  Yeah.

25      Mr. Sorola, have you seen these?

1          MR. SOROLA:  I don't know which --

2          THE COURT:  Let Mr. Rola see them first.  Mr. Sorola see

3   them.

4          MR. SOROLA:  Yes, Your Honor.  I've seen these.

5          MR. HAGEN:  So --

6          MR. CORLEY:  May I approach, Your Honor?

7          THE COURT:  Yes.

8      All right.  I'm admitting Exhibits 10 and 11.

9      All right.  Anything else from the government?

10         MR. HAGEN:  No.  I mean, my understanding, the motion to

11  suppress is that the stop was illegal and that the arrest

12  warrant was based on that, which, you know, my argument would be

13  if Your Honor doesn't like the stop, there's certainly a good

14  faith exception that would apply to the arrest and the search

15  warrant wherein ATF agents were not present on the 29th relied

16  on.

17         THE COURT:  What are you referring to as "the stop"?

18         MR. HAGEN:  The August 29th encounter where

19  Mr. Massey -- August 29th was out at the Sabal Palms, Your

20  Honor.  He was arrested on October 20th.  So I'm referring to

21  the events of the 29th.  He wasn't arrested until some months

22  later.

23         THE COURT:  Okay.  All right.  Does the defense wish to

24  put on any evidence?

25         MR. SOROLA:  Oh, no, Your Honor.

1          THE COURT:  Okay.  All right.  Mr. Sorola, help me here.

2     What is your argument?  Let me take them one at a time.  Let's

3     take the AK47 or whatever it is, the weapon that Agent Cantu saw

4     him carrying when he encountered him on August 29th.  I mean, is

5     there -- is that a weapon you're trying to suppress?

6          MR. SOROLA:  Yes, Your Honor, the weapon that Mr. Massey

7     was said to have been carrying that Agent Cantu said he was

8     carrying.

9          THE COURT:  Okay.  But what's the -- what's the grounds

10    for that one?  I mean, whether it's a law enforcement officer or

11    even a person walking down the street, if I say, "Look, he's

12    carrying that weapon," how can I suppress that?  On what legal

13    grounds?

14         MR. SOROLA:  He was detained, Your Honor.  The weapon

15    was in his vehicle, and Mr. Massey is detained.  There are no

16    exigent circumstances any longer.  This investigation took three

17    or four hours, and he's not free to leave.  And at this point --

18         THE COURT:  But he had encountered the weapon the moment

19    Agent Cantu saw him.  I mean, it's not like a *Terry* stop where

20    you're looking around the car and looking in the trunk and

21    getting the dogs to sniff or whatever.  I mean, that weapon was

22    in plain view, wasn't it?  I mean --

23         MR. SOROLA:  Well, according to Agent Cantu, it was.

24         THE COURT:  Okay.  All right.  Now, what about -- I

25    guess the next weapon would be the holstered weapon?

1    MR. SOROLA:  Which -- yes, that Agent Cantu said that

2    Mr. Massey had in his belt because there's no holster anywhere.

3    THE COURT:  Okay.

4    MR. SOROLA:  But it's our position that that weapon

5    wasn't in Mr. Massey's possession.  It was in the vehicle.  It

6    was -- that's where we differ.

7    THE COURT:  Okay.  So Agent Cantu said it was on his

8    person but not visible.  And it's the defense's position it

9    wasn't even on his person.

10    MR. SOROLA:  Correct.

11    THE COURT:  That it was in the ATV.

12    MR. SOROLA:  Correct, Your Honor.

13    THE COURT:  Okay.  All right.  Then what about the other

14    two weapons at the hotel?  I mean, if he's being arrested

15    pursuant to a warrant and they find a weapon on him, I mean,

16    isn't the case law pretty clear that you can do -- that an

17    officer is entitled to do a pat down or a frisk or whatever you

18    want to call it when they're arresting somebody just for

19    personal safety purposes?

20    MR. SOROLA:  But let's look to the affidavit,

21    paragraph 6, Your Honor.

22    THE COURT:  Okay.

23    MR. SOROLA:  And it refers -- this is the affidavit, the

24    attachment to secure the arrest warrant.  And it says during the

25    interview of Massey by Special Agent Cordova, an HSI special

1   agent, Massey admitted to both ownership of two weapons.

2       And it's our position in the motion to suppress that he

3   wasn't free to leave.  This wasn't a -- this was a custodial

4   interview because the 15 to 20 law enforcement officers around

5   him, he couldn't leave.  And Agent Cantu testified that he

6   directed Massey not to leave.  And when asked, "What would you

7   have done?"

8       "I would have arrested him."

9       He wasn't free to go.  He had to cooperate.  And this

10  information is used to secure the arrest warrant.

11          THE COURT:  So it's kind of a fruit of the poisonous

12  tree argument.

13          MR. SOROLA:  Exactly, Your Honor.

14          THE COURT:  All right.  And then that would then also

15  apply to the weapon found in the motel room.

16          MR. SOROLA:  Yes, Your Honor.

17          THE COURT:  Okay.  All right.  Okay.  Cristi, before I

18  lose these.

19      All right.  Is there anything else I need to hear with

20  regard to these two motions?

21          MR. HAGEN:  The -- well, in response -- does Your Honor

22  want me to respond to the argument that Mr. Sorola just made?

23          THE COURT:  Yes.

24          MR. HAGEN:  Okay.  I mean, if you took one paragraph, I

25  think that -- that the August 29th investigation which included

1   observation, seizure of weapons and interview of Mr. Massey, I

2   think they're all legal and reasonable under the circumstances.

3       In looking at the arrest warrant, paragraph 6, if you

4   took -- which I think is fine.  I mean, paragraph 6 says that,

5   "Massey told FBI Agent David Cordova and Jeremy Bergeaux

6   admitted to both the ownership of the Zastava pistol and to

7   loaning it to Foerster."

8       Massey is not even charged with possessing the Foerster -- I

9   mean the Zastava pistol.  Massey is not charged with possessing

10  that.  If you took that out, the -- the arrest warrant is still

11  sufficient because it references observations made by Border

12  Patrol Agent Cantu where he observed the defendant carrying the

13  Centurion 7.62 rifle.  So I think the affidavit associated with

14  the arrest warrant is more than adequate.

15      THE COURT:  All right.  It's going to take me some time

16  to look at this.  Have y'all talked about how you want to

17  proceed with these case -- with the case in general --

18      MR. SOROLA:  Yes, Your Honor.

19      THE COURT:  -- assuming that I end up overruling the

20  motions?

21      MR. SOROLA:  Yes, Your Honor.  The only argument I would

22  have in the motion to dismiss, in my looking at this, I ended up

23  at the Fifth Circuit Pattern Jury Charge and the third element,

24  the foreign commerce and interstate commerce.  I believe I

25  addressed that in my motion.  I'd just point that out to the

1   Court.

2       Judge, Mr. Hagen and I have talked about this.  We're not

3   ready to go to trial this week.  We're asking the Court for

4   either the May, middle May to late May or early June trial

5   docket.  And, of course, depending on the motions, we can be

6   ready.  I believe both of us can be ready.  I do need to conduct

7   further discovery given the testimony.  There may be computer

8   records or some type of digital recording out there which would

9   timeline the events which Agent Cantu testified to.  I don't

10  know.

11          THE COURT:  Well, I can -- I can set it for June's

12  docket or I can set it for July's docket.  Which do you want?

13          MR. HAGEN:  I think Mr. Sorola is getting married in

14  July.

15          MR. SOROLA:  So I want July.

16          MR. HAGEN:  He's looking for a conflict.

17          MR. SOROLA:  I have to go to federal court.

18          THE COURT:  I've never seen that work as an excuse to

19  get out of a wedding.

20          MR. HAGEN:  June, Your Honor.

21          MR. SOROLA:  June.

22          THE COURT:  All right.  What's our speedy trial status?

23          MR. SOROLA:  Can I have a moment to --

24          THE COURT:  Yes.

25          MR. SOROLA:  I don't -- well, I don't know.  I'm the

1  second attorney.  Mr. Cyganiewicz withdrew.  I don't know if

2  Mr. Cyganiewicz --

3        MR. HAGEN:  I don't think there's been a waiver, and I

4  think we need a waiver if we're not going to trial this month.

5        THE COURT:  Yeah.  If we're not going to trial, I think

6  I need a waiver and -- and a --

7        MR. SOROLA:  I have the waiver.  If I can have, Your

8  Honor, a few minutes to discuss the waiver.

9        THE COURT:  Sure.

10        MR. SOROLA:  I didn't discuss this issue with my client

11  prior to coming into court.

12        THE COURT:  Go ahead.

13        MR. SOROLA:  May I approach, Your Honor?

14        THE COURT:  You may.

15     All right.  Mr. Massey has signed a waiver of his right to

16  speedy trial.  That being the case and the case that the defense

17  needs time to do some more discovery, I'm going to find that the

18  ends of justice are better served by granting the continuance,

19  and they outweigh the best interests of the public in a speedy

20  trial.

21     Any objection to that finding?

22        MR. HAGEN:  No objection, Your Honor.

23        MR. SOROLA:  None from the defense, Your Honor.

24        THE COURT:  All right.  Mr. Massey, you have no

25  objection to me setting this on the June -- on June's docket?

1          THE DEFENDANT:  No, sir.

2          THE COURT:  All right.  I'll set this for final pretrial

3     June the 2nd at 8:30, jury selection on the 4th.  And that's

4     obviously assuming that I don't grant the defendant's motion.

5     But in between now and then, I will rule on the defense motion

6     as soon as I can, although I have lots of things on my plate at

7     the moment.

8          MR. HAGEN:  I'm aware of that, Judge.  I haven't -- I

9     know at the beginning of this hearing, we discussed our response

10    to the motion to dismiss, and we haven't really discussed that

11    at all.  I know there's Fifth Circuit precedent I think that's

12    directly on point.

13         THE COURT:  Well, I would like you to file one,

14    especially on -- not necessarily on the factual points because

15    we've talked about those, but on the legal points.  And if you

16    could do that, say, by the 10th of April?

17         MR. HAGEN:  Yes, Your Honor.  You're talking about in

18    response to the motion to dismiss?

19         THE COURT:  Yes.  The motion -- where -- the difference

20    between the Texas law and the federal law and the federal law

21    vis-a-vis the Constitution, Second Amendment of the

22    Constitution.

23         MR. HAGEN:  The -- I responded to the Second Amendment

24    argument in my response to the defendant's motion to dismiss.

25    But is there something that Your Honor -- a more specific

1  question that's arisen from today's events that Your Honor wants

2  addressed?

3       THE COURT:  No.  If you're happy with your response the

4  way it is, then I'm -- I mean, I thought you were asking me for

5  time to supplement.

6       MR. HAGEN:  Well, I would like to supplement certainly

7  on the -- if Your Honor is concerned about Texas versus federal

8  law.  I know that's being addressed by the Fifth Circuit.

9       THE COURT:  Okay.  Well, let me leave it this way.  If

10  you want to file anything additional, file it by April 10th.

11       MR. HAGEN:  Yes, sir.

12       THE COURT:  And, Mr. Sorola, I'll give you then until

13  the 17th to reply if you feel the need for a reply.

14       MR. SOROLA:  Yes, Your Honor.

15       THE COURT:  All right.  Okay.  That being the case, this

16  was set for final pretrial tomorrow, right?

17       MR. SOROLA:  Correct, Your Honor.

18       THE COURT:  Y'all are excused from that.

19    Steve, Mr. Massey's in compliance?

20       PRETRIAL OFFICER:  Yes, Your Honor.

21       THE COURT:  All right.  Mr. Massey, I'm going to allow

22  you to remain free.  Please comply with all the rules and

23  regulations that you've been under and stay in touch with

24  Mr. Sorola, as he may need to talk to you about various things

25  as they come up, all right?

1    THE DEFENDANT:  Yes, sir.

2    THE COURT:  Then we'll stand adjourned.

3    Wait, wait.

4    Oh.  The warrant and the application for the search warrant

5    are sealed, and you now entered them into evidence.  Do you want

6    me to seal these two documents?  They're Government Exhibit 10

7    and 11.

8    MR. HAGEN:  I suppose since -- I really am not concerned

9    about them being -- whether they're sealed or not.

10    THE COURT:  What's your druthers, Mr. Sorola?

11    MR. SOROLA:  I don't see any reason to seal them.  I

12    mean, it's not like --

13    THE COURT:  Okay.  If neither side thinks they ought to

14    be sealed, I'm fine with it.

15    MR. HAGEN:  Yes, sir.

16    THE COURT:  We'll stand adjourned.  Thank y'all.

17    *(Court adjourned.)*

18                              * * *

19    (End of requested transcript)

20                              -oOo-

21    I certify that the foregoing is a correct transcript from

22    the record of proceedings in the above matter.

23    Date:  April 8, 2015

24

25                    /s/_____
                      Signature of Court Reporter
                      Barbara Barnard